Filed 2/26/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VICTAULIC COMPANY,<br><br>    Plaintiff, Cross-defendant and<br>    Respondent,<br><br>v.<br><br>AMERICAN HOME ASSURANCE<br>COMPANY et al.,<br><br>    Defendants, Cross-complainants<br>    and Appellants. | A146617<br><br>(Alameda County<br>Super. Ct. No. RG12642929) |

Victaulic Company (Victaulic), a manufacturer of plumbing products, sued its insurers in connection with nine product liability claims against Victaulic that resulted in litigation. Following a favorable ruling for Victaulic on summary adjudication (potential for coverage and thus a duty to defend) and then a favorable ruling in a court trial for declaratory relief (duty to indemnify), the case proceeded to a jury trial on Victaulic's claim of bad faith. That trial lasted three and one-half weeks, during which numerous witnesses testified and over 100 exhibits were introduced.

One of those witnesses was Nancy Finberg, the examiner on a majority of the claims, who had also verified the insurers' responses to Victaulic's requests for admissions (RFAs). Reversing an in limine ruling to the contrary, the trial court allowed Victaulic to interrogate Finberg about those responses, interrogation twice interrupted by interrogation by the court itself, the second round of which was abruptly halted by the court for an in-chambers conference where the court concluded Finberg had "made an admission that she perjured herself." Finberg's testimony was stopped at that point, and when she resumed the stand the next day, represented by personal counsel, the court ruled

1

that she could, on a blanket basis, claim the Fifth Amendment privilege against self-incrimination—and would do so in front of jury.

And so came Victaulic's closing arguments, with their focus on "Finberg," "RFAs," "lies," and "penalty of perjury," words used so often, and so interrelatedly, that it is truly difficult to count. The jury deliberated for some five hours, and returned with a verdict answering a total of six separate questions, one of which had seven subparts, a total of 13 separate questions. That verdict awarded damages for breach of contract totaling $1,073,868.80, finding for Victaulic on each of seven claims in the exact amount sought. The verdict awarded attorney fee damages for bad faith of $8,259,712.31, the exact amount Victaulic's expert testified to. And the jury also found, by a nine-to-three vote, the insurers acted with fraud, oppression, or malice committed by a managing agent. All this, after a three and one-half week trial, in some five hours of deliberation.

The punitive damages trial followed shortly, a trial that was nothing but argument. Following brief deliberation, by a ten-to-two vote the jury awarded $46 million, the amount suggested by Victaulic's counsel.

The insurers appeal, asserting six separate claims of error why the verdict cannot stand. We agree with the insurers there was error, beginning with the court's allowance of the use of the RFA responses, compounded by the court's intensive questioning of Finberg, and compounded further by several errors in how the court handled Finberg's invocation of the Fifth Amendment privilege. We conclude such error was prejudicial, and thus reverse on that ground, without the need to address the insurers' other arguments.

## BACKGROUND

### The Parties

Appellants are three insurance companies, American Home Assurance Co. (American Home), Insurance Company of the State of Pennsylvania (ICSOP), and National Union Fire Insurance Company of Pittsburgh, PA (National Union). All three companies are members of the American Insurance Group (AIG), and will usually be referred to collectively, as the insurers or AIG.

Respondent is Victaulic, a developer and producer of mechanical pipe joining systems, headquartered in Easton, Pennsylvania. It is a global company with major facilities that manufactures over 60,000,000 units per year, and employs over 3,600 employees worldwide. As one underwriter described Victaulic, it is "one of the world's leading developer[s] and producer[s] of unique mechanical pipe coupling systems. They manufacture pipe couplings, fittings, valves, custom ductile iron castings and plastic piping systems. . . . Victaulic products are now in use worldwide for a variety of industrial, commercial and institutional uses including heating, air conditioning, fire protection including sprinkler heads, mining, maritime, oil field, municipal treatment and automotive."

**The Insurance Program**

Victaulic approached AIG concerning possible insurance coverage, and such coverage was arranged, under a complex program with layers of insurance as described below. While the coverage was comprehensive, it was understood by AIG underwriters that the primary risk Victaulic would present was for its products. An early memorandum from an underwriter noted that Victaulic "is clearly a product risk," going on to note that "[s]ince the main products are different types of pipe couplings, the main hazards are product failure, i.e., pipe leaking or bursting, which can cause extensive property damage and business interruption." Another memorandum noted that "the products exposure has highest frequency and activity level," and "[m]ost claims [are] a result of water damage to third party locations." As AIG underwriter Clara Pincus would come to testify at trial, "obviously we knew that we had a products liability risk on our hands and the potential claims associated with it."

The insurance program was a customized, specialized plan that included a primary policy and also excess and umbrella policies. The original primary policy had policy limits of $1 million, later increasing to $2 million. Above the primary policy was an umbrella policy with $25 million in limits, above which were two excess policies, each with $25 million in limits.

3

The insurance program also included three interrelated agreements regarding the primary layer of coverage: (1) a large risk rating plan (LRRP), (2) a payment agreement, and (3) a direct pay addendum (DPA) to the payment agreement. The effect of these agreements was that claims were handled differently than in the usual insurance situation, which is directly between insurer and insured. The program here involved the participation of a third party claims administrator, York Claims Association (York), and worked as follows: Victaulic would fund an account maintained by York, from which defense and indemnity costs under the primary policies would be paid based on a complicated formula. The account would be used to cover 100 percent of the indemnity and defense costs for any clam within Victaulic's "retained amount" (which under the LRRP varied by year from $250,000 to $1 million). So, if a claim was resolved by settlement or judgment within the retained amount, the insurers had no obligation to pay any defense or indemnity costs on the claim. Thus, until a claim was resolved—and the primary insurer's payment obligations able to be calculated—Victaulic fronted all costs through the York account. Once the calculation of relative responsibility was made, the primary insurer then reimbursed Victaulic.

As Victaulic describes in its brief: "In effect, the LRRP and DPA result in Victaulic initially funding the costs that AIG incurs defending Victaulic under a given primary policy. But because those agreements do not apply to the Program's umbrella or excess policy layers, AIG is solely responsible for all defense and indemnity costs once the applicable primary policy exhausts. [¶] By designing the Program such that the ancillary agreements apply only to its primary polices, however, AIG created for itself an economic incentive to slot Victaulic claims in stacks with unexhausted primary policies: 'If the claims are chargeable to the primary policy, a large proportion of those claims would be [] the responsibility [of] Victaulic. If they were charged with the umbrella policies, they would be for AIG's account.' " So, Victaulic would come to assert in support of its position at trial, these economic incentives would "drive AIG's improper claims handling decisions here."

Another aspect of Victaulic's theory at trial might be called AIG's motive for some aspects of its claims handling, which was that beginning with the renewal process for the 2009–2010 policy period, AIG became concerned about its financial exposure under the insurance program. And so, again quoting Victaulic's brief, "AIG's excess underwriters agreed they needed the primary policy's products coverage aggregate limit increased. This would delay or prevent its exhaustion, thereby protecting the excess policies. But the underwriters also recognized that AIG 'is in jeopardy of losing this [client] as well if we change our program.' Accordingly, [AIG] Chief Underwriting Officer Stafford Hay ultimately made a 'business decision' in September 2009 to renew the 09/10 Program policies on the prior year's terms . . . the 'underlying Product aggregate will need to be increased to $4M next year in order for us to continue any further support.' " In short, because of AIG's long standing relationship with Victaulic, it made a business decision to continue support over a products aggregate that was deemed too low by the actuaries.

The same concern was raised again during the 2010–2011 renewal process. Acknowledging again that Victaulic was a "loyal and profitable [AIG] account," Hay concluded that the program presented AIG with "a lot of exposure on a class that is prone to a frequency of [property damage] claims . . . some of them severe." AIG therefore increased the 2010–2011 primary policy's product aggregate limit from $2 million to $3 million.

**The Claims and the Claim Handlers**

What would ultimately come to be in issue were nine specific claims made against Victaulic that resulted in lawsuits against it, the first of which was in March 2012, called the Elizabeth claim. Before discussing it and the other claims, we set out the primary participants in the claims handling process at AIG, who would come to testify—or be testified about—at trial:

Megan Watt was global head of complex casualty at AIG. Under her was James Scalise, who took control of the Victaulic program. Scalise then reassigned the handling of the claims to Assistant Vice President Keith Taylor and, under him, to Nancy Finberg,

5

director of complex claims. As noted above, and discussed in detail below, Finberg became a focus of the trial, and whose handling by the trial court is at the heart of the insurers' appeal.

Turning back to the claims, the Elizabeth claim was a lawsuit in Oregon alleging that rubber on a Victaulic plumbing component installed in a condominium complex was deteriorating, causing black specks to appear in the water. Responding to Victaulic's "request for coverage," on March 20, 2012, Taylor wrote a letter with what he called AIG's "coverage position." The letter summarized the underlying complaint, set forth in four pages various bases for excluding or denying coverage, and concluded that AIG was reserving "all rights under the policies."

AIG had retained Oregon attorney Anne Cohen to defend Victaulic in the Elizabeth claim. And on June 21, Taylor telephoned Cohen to advise that "AIG had filed a lawsuit against Victaulic," a reference to a declaratory relief lawsuit AIG had filed in Pennsylvania. Before discussing it and the other lawsuits, we set forth a complete list of the claims that ultimately came to be in issue between Victaulic and the insurers, including their outcome or status:

1. Elizabeth: A lawsuit in Oregon described above. Victaulic settled this claim for $150,000 and a warranty.

2. Essex: A condominium construction defect lawsuit in California, alleging that rubber on Victaulic valves and gaskets deteriorated, causing black specks to appear in the water. American Home settled this claim for $320,000.

3. Edge: A condominium construction defect lawsuit in Oregon, alleging black specks due to deteriorating rubber on Victaulic valves, as well as property damage due to leaky pipes. This claim resulted in a $113,726 judgment against Victaulic, paid by National Union.

4. Benson: A condominium construction defect lawsuit in Oregon, alleging black specks in the water due to deteriorating rubber on Victaulic valves. This claim resulted in an approximately $2 million judgment against Victaulic, which at the time of trial was on appeal at National Union's expense.

6

5. Avenue:  A condominium construction defect lawsuit in Oregon, alleging leaks and black specks due to deteriorating valves.  At the time of trial, this claim was ongoing, with National Union funding the defense.

6. 1521:  A construction defect lawsuit in Washington, alleging defective Victaulic plumbing components caused water damage to a condominium complex.  Victaulic settled this claim within its retention for $10,000.

7. Grant:  A condominium construction defect lawsuit in Colorado, alleging degraded Victaulic valves and couplings had caused property damage.  Victaulic settled this claim within its retention for $20,000.

8. United Hospital:  A subrogation lawsuit in West Virginia brought by Travelers Insurance Company to recover the cost of repairing a hospital damaged by flooding from failed Victaulic couplings.  Victaulic settled this claim for $1.2 million, $700,000 of which was contributed by AIG companies.

9. Massachusetts Water Resources Authority (MWRA):  A product liability lawsuit in Massachusetts, alleging a Victaulic coupling installed in a Boston municipal water line had broken, resulting in millions of dollars in investigation and repair costs.  Victaulic settled this claim for $875,000, $234,615 of which was contributed by AIG companies.

All of these claims were tendered to York.  And "in consultation with" Victaulic, counsel was retained to represent Victaulic in all of them:  Craig Diamond to defend the Essex claim in California; AIG panel attorney Phil Sbrolla to defend the United Hospital claim in West Virginia; AIG panel attorney Grace Garcia to defend the MWRA claim in Massachusetts; and AIG panel attorney Cohen to defend the other six, in Oregon, Washington, and Colorado.

There was no question that all four of these attorneys performed well, as Victaulic's general counsel Mark Van De Voorde would confirm at trial:  all attorneys "did an excellent job."

**The Lawsuits**

In June 2012, the insurers filed a declaratory relief action in Pennsylvania, Victaulic's headquarters, and also the home state of National Union and ICSOP. The Pennsylvania action, which came to be referred to as PA1, sought a declaration as to whether three of the claims—Essex, Edge, and Elizabeth—involved "property damage" caused by an "occurrence," and whether any of the damages were excluded as business risks. The basis for PA1 was the opinion in *Kvaerner Metals v. Commercial Union Ins.* (2006) 589 Pa. 317 [908 A.2d 888], holding that claims of faulty workmanship are not covered "occurrence[s]." PA1 was ultimately dismissed by court order on December 31, 2013, on the basis that the third party claimants were indispensable parties under Pennsylvania law, and were not amenable to jurisdiction there.

After PA1 was filed, Watt, joined by AIG's head of underwriting and AIG's coverage counsel, met with representatives of Victaulic. Following that meeting, Victaulic decided not to renew the insurance program with AIG.

Meanwhile, in August 2012, Victaulic filed this action in California, alleging that defendants had breached their duty to defend the Essex, Edge, and Elizabeth claims, forcing Victaulic to pay substantial sums to defend itself. The complaint alleged claims for breach of contract, bad faith, intentional misrepresentation, and declaratory relief. AIG sought to dismiss or stay the California action on the basis of the Pennsylvania action, but was unsuccessful.

In December 2013, the insurers filed a cross-complaint in the California action seeking a declaration they did not owe payments for seven of the claims—Essex, Elizabeth, Edge, 1521, Benson, Grant, and Avenue. Victaulic later obtained leave to add the United Hospital and MWRA claims, so all nine claims were involved in the California action.

In May 2014, Victaulic filed a second amended complaint (SAC), the operative complaint here. In light of the fact that defenses were being provided, Victaulic alleged that the insurers should be liable for "failing to acknowledge their duty to defend Victaulic, meaningfully participate in the defense or settlement of Claims, acknowledge

8

coverage for and/or pay covered settlements in a timely manner, and otherwise pay amounts due," and that they "have unreasonably and without justification refused to provide and/or delayed the payment of policy benefits." The SAC also sought declaratory relief that the allegations in each of the underlying actions triggered defendants' duties to defend and indemnify under the program.

To complete the lawsuits, in April 2014 the insurers filed a second action in Pennsylvania (PA2), seeking a declaration as to the United Hospital and MWRA claims. PA2 was later dismissed in light of the California action.

### The Trial Court Grants Summary Adjudication for Victaulic on the Potential for Coverage

Both sides moved for summary adjudication. The insurers sought summary adjudication on the basis that Pennsylvania law applied, that under *Kvaerner* "faulty workmanship" is not an "occurrence," and thus none of the nine claims would be covered.

Victaulic's motion sought summary adjudication that the insurers had a duty to defend and indemnify it in connection with three claims—MWRA, United Hospital, and Edge.

The trial court heard argument on the motions on December 4, 2014. And on December 12 the court entered its order denying the insurers' motion and granting in part Victaulic's, specifically holding that the insurers had a duty to defend the three claims because they all potentially involved "property damage" caused by an " 'occurrence.' " The order noted in part that "even if AIG were correct that Pennsylvania law applies, summary adjudication in Victaulic's favor is appropriate. In Indalex Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pa. (2013) 83 A.3d 418, a Pennsylvania appellate court specifically rejected the arguments AIG makes here." The order further held that there were triable issues on the scope of indemnity as to what portions of the settlements are for covered losses and must be indemnified.

The court ordered the case bifurcated, with the declaratory relief claim to be tried first in a bench trial, which came to be called Phase 1.

9

**The Phase 1 Trial**

Phase 1 took place over 12 trial days, in February and March 2015. On June 10, 2015, the trial court issued its statement of decision, addressing two fundamental issues: "(1) does AIG have the duty to defend Victaulic in each of the underlying actions; (2) does AIG have the duty to indemnify Victaulic in each of the underlying actions." The court answered yes to both questions, holding for Victaulic all the way.

With respect to AIG's position as to "occurrence," the court first said that "[i]nitially, AIG contended that the policies did not cover any of the claims found in any of the lawsuits for lack of an 'occurrence' that would trigger coverage, redefining the meaning of 'occurrence' from the definition earlier used by the parties." The court then noted that "AIG persisted in its contention that Victaulic had no products liability coverage under its policies for want of an 'occurrence' until a Pennsylvania case entitled *Indalex . . .* became final in mid-2014, and until after this court ruled, in the context of the parties' competing summary judgment motions, that AIG's contentions regarding the definition of 'occurrence' were incorrect as a matter of law." And, the court went on, "[i]n a stark reversal of its previously-stated contentions, AIG now contends that it accepted the duty to defend all along in the underlying actions and that AIG has performed that duty," leading to this observation: "This change in position has confused the matters pending herein, as AIG has now adopted positions contrary to its contentions in its Cross-Complaint, but has not, however, dismissed any of the causes of action in the Cross-Complaint."

The court made similar findings regarding the duty to defend. It found that Taylor and Finberg "[e]ach testified during trial that AIG never denied that the [Victaulic] claims . . . gave rise to a potential for coverage and, accordingly, had always acknowledged the existence of a duty to defend Victaulic." But the court noted, "In dramatic contrast to these averments, AIG initiated litigation against Victaulic in Pennsylvania asserting that they had no duty to defend Victaulic in connection with the *Essex*, *Edge Lofts*, and *Elizabeth Lofts* cases on grounds that, *inter alia*, garden-variety

product liability claims do not constitute 'an occurrence' under AIG's policies with Victaulic."

In sum, in this sternly worded statement of decision, the trial court granted declaratory relief in Victaulic's favor on the duty to defend, holding that all the underlying claims triggered the potential for coverage. It also held that defendants had a duty to indemnify with respect to all of the claims except Avenue, for which the duty to indemnify could not be finally determined until the claim resolved.

The trial court set the case for Phase 2, a jury trial on the issues of breach of contract, bad faith, and punitive damages.

**The Phase 2 and Phase 3 Trials**

Phase 2 began on February 4, 2015. It would last some three and one-half weeks, during which the jury would hear from numerous witnesses and over 110 exhibits would be introduced. The bulk of Phase 2 was devoted to Victaulic's claim of bad faith, a "cornerstone[]" of which was that the insurers acted unreasonably in litigating against Victaulic, and Victaulic sought to introduce evidence of the insurers' litigation positions in the Pennsylvania and California actions. The trial court initially ruled that such evidence would be excluded, but after Phase 1, Victaulic convinced the court to reconsider, and the court let the evidence in.

And so it began, in the opening statement in Phase 2, where counsel for Victaulic displayed the PA1 and PA2 declaratory relief complaints and told the jury that the insurers "broke [their] promises" by suing, that an insurer should not act as its insured's adversary as AIG did here when it filed the lawsuits. And during its case-in-chief, Victaulic called AIG claims personnel Taylor, David Luden, and Finberg as adverse witnesses, examining them in great detail about the litigation positions the insurers had asserted in the Pennsylvania complaints and in the California action.

We need not detail all that examination here, but do note that one aspect of the court's ruling—and its fallout—is at the heart of two of the insurers' arguments on appeal, as discussed in detail below. Suffice to say here that it began with the trial court's allowance of Victaulic's counsel to interrogate Finberg with the insurers'

11

responses to the RFAs, which was improper enough.  This error was compounded by the court's own involvement—twice—in the questioning of Finberg, the second round of which was abruptly halted for an in-chambers conference where the court concluded Finberg had "made an admission that she perjured herself."  Finberg's testimony was abated at that point, and when she resumed the stand the next day, represented by personal counsel, the court ruled that she could claim the Fifth Amendment privilege against self-incrimination on a blanket basis, and would do so in front of the jury.  Following that, Finberg was excused.  But her testimony remained in the case.

Instructing the jury, the court gave the CACI instructions pertinent to a bad faith case.  (See CACI No. 2330 et seq.)  Both sides had proposed special instructions, the insurers requesting instructions on principles such as the genuine dispute doctrine and that reservation of rights letters and declaratory relief actions are not evidence of bad faith.  The trial court refused the insurers' special instructions.  The trial court also gave CACI No. 3946 on punitive damages, which in its last paragraph provides that an employee is a " 'managing agent' if he or she exercises substantial independent authority and judgment in his or her corporate decision making such that his or her decisions ultimately determine corporate policy."  At Victaulic's request—and over the insurers' objection—the court added a further instruction that told the jury in the case of insurance companies, "[i]f an employee has substantial independent authority to pay or deny a claim for benefits under an insurance policy, then that individual is a managing agent for the purpose of awarding punitive damages."[1]

---

[1] Such an instruction might be problematic.  The instruction was, according to Victaulic, supported by *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822–823.  But as the leading California insurance treatise describes, "It is difficult to reconcile more recent Supreme Court authority with *Egan*'s conclusion that merely vesting an employee with discretion over the handling of plaintiff's insurance claim renders that employee a 'managing agent' for punitive damages purposes.  Only persons with discretionary authority to determine *formal* corporate policy affecting a substantial portion of the company are 'managing agents' within the meaning of [Civil Code] §3294(b).  [*Roby v. McKesson Corp.* (2009) 47 [Cal.]4th 686, 714]."  (Croskey, et al., Cal. Practice Guide:  Insurance Litigation (The Rutter Group 2017) ¶ 13.407.1,

12

It was against that background that Victaulic's closing argument focused on Finberg and her "lies" in the RFAs—and all of it under penalty of perjury.

The jury deliberated for some five hours, and on July 30 returned with a verdict answering a total of six separate questions in favor of Victaulic. The jury awarded damages for breach of contract on each of the seven claims[2] in the exact amount sought, down to the penny. Likewise the *Brandt* bad faith attorney fee damages of $8,259,712.31, the exact amount its expert testified to.[3] The jury also found, by clear and convincing evidence, fraud, oppression, or malice committed by a managing agent. The punitive damages trial followed, where, following brief deliberation, the jury awarded Victaulic $46 million.[4]

Following the verdict, on September 4, the trial court awarded Victaulic approximately $5.5 million in cost of proof sanctions under Code of Civil Procedure section 2033.420 for the insurers' refusal to admit there was a "potential for coverage" for the claims and that the damage alleged was caused by an "occurrence." The trial court noted that the award duplicated the *Brandt* fee award.[5]

On October 19, the trial court entered judgment in conformity with the above, adding some $840,000 in prejudgment/postjudgment interest.

The insurers moved for judgment notwithstanding the verdict and new trial on multiple grounds, including excessive damages. The trial court denied the motions, and the insurers appealed.

---

p. 13-106.)

[2] Two of the claims, 1521 and Grant, were not submitted to the jury.

[3] *Brandt v. Superior Court* (1985) 37 Cal.3d 813 (*Brandt*). Actually the bad faith damage award was slightly larger than the expert's figure because it includes Victaulic's general counsel's own receipts for travel and other litigation expenses.

[4] The insurers assert that this award is "unsupported, excessive, and unprecedented." And their reply brief has a footnote that, discussing various awards, says: "To our knowledge, no punitive damage award even approaching $46 million has been upheld in any California published decision in a bad faith case."

[5] The insurers paid this award plus interest, and it is not at issue on appeal.

## DISCUSSION

### Introduction and Background

The insurers assert six separate arguments why the judgment cannot stand, the first of which is that the trial court committed reversible error in two respects. The first is allowing Victaulic to present evidence of defendants' litigation conduct, as part of which the insurers contend that it was error to allow Victaulic's counsel to use the responses to the RFAs in the examination of Finberg.[6] The second is the court's handling of Finberg, including the court's own interrogation of her, its abrupt halting of her testimony, and how the court handled the situation from then on, when Finberg asserted her privilege against self-incrimination. We agree—there was error in several respects.

By way of background, Finberg was an experienced claims person with 35 years' experience, who was involved in handling six of the claims here. She was also the representative who verified the insurers' responses to the RFAs sent by Victaulic, verified, of course, under penalty of perjury.

As pertinent here, referring to a specific third party claim, the RFAs asked the insurers to admit that the claim created a "potential for coverage under one or more of the insurance policies." The insurers' responses, prepared and signed by their attorneys, were after a series of objections: "Deny."[7]

---

[6] The other part of the first argument, one we need not address, asserts that the filing of the declaratory relief actions was privileged under Civil Code section 47, subdivision (b), and thus could not serve as a basis for tort liability outside of a malicious prosecution claim. (See generally *California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1330.)

[7] The actual response, illustrated here by one response on behalf of National Union, was as follows: "NATIONAL UNION incorporates by reference its general objections and reservations as though fully set forth herein. NATIONAL UNION further objects to this request in that it is vague, ambiguous, overbroad and unduly burdensome due to the definition of 'POTENTIAL FOR COVERAGE.' NATIONAL UNION further objects to this interrogatory as vague and ambiguous with respect to the phrase 'the allegations.' NATIONAL UNION further objects to this interrogatory on the ground that it seeks information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and

14

Finberg was called by Victaulic as an adverse witness under Evidence Code section 776. She had noted in the claim files that there was a potential for coverage, and testified that in her role as a claims examiner she believed the claims asserted property damage caused by an occurrence, and that is why the claims were defended through the insurance program, to Victaulic's benefit. The RFAs, on the other hand, responded as noted above: after all the objections, "Deny." Despite that she did not prepare the responses, Finberg was interrogated at length about all this, interrogation twice interrupted by the court, the upshot of which was Finberg's invocation in front of the jury of her privilege against self-incrimination—and her departure from the witness stand.

The story cannot adequately be told by description, or narration, or summation, or paraphrasing. It can adequately be told only by the transcript itself, a story that goes as follows:

Confronting Finberg with the responses to the RFAs, counsel for Victaulic asked: "So each of the seven cases at issue in this litigation presented a potential for coverage; right?" Finberg responded, "Are you making a distinction between the handling of the claims or the coverage litigation? Because they're two separate things." Counsel then clarified his question, leading to this colloquy:

"[MR. JEAN (counsel for Victaulic)]: So in the underlying claims handling, you make a determination as a potential for coverage one way, and then in the coverage case, this litigation, the potential for coverage is determined differently?

"[MS. FINBERG]: They're two separate things.

"THE COURT: Answer his question. Are they determined differently?

"[MS. FINBERG]: I don't know that I can answer yes or no because they're two separate things."

Counsel for Victaulic began to formulate a question, interrupted by the court: " I can see that we should take our break now." Following the break, the questioning resumed. This is how it went:

without waiving the foregoing objections, NATIONAL UNION responds as follows: [¶] Deny."

15

"MR. JEAN: . . . Now, Ms. Finberg, before we left for break we were talking about potential for coverage. [¶] Do you recall that?

"[MS. FINBERG]: Yes.

"[MR. JEAN]: And I think where we left off, you had—you started talking about that maybe you handled the potential for coverage one way in the—when you handled claims, and perhaps in the litigation or this litigation maybe it's handled differently? [¶] Did I understand your testimony correctly?

"[MS. FINBERG]: Well, there are two separate issues, two separate things.

"THE COURT: That was a yes-or-no question.

"[MS. FINBERG]: I don't know if I can answer yes or no, Your Honor, the way—

"THE COURT: You don't know if you can answer that.

"[MS. FINBERG]: The way he asked it. [¶] I'm sorry, would you ask it again.

"THE COURT: Why don't you rephrase the question. The witness doesn't understand it.

"MR. JEAN: Thank you. I will. [¶] . . . And I think what I—this is just what I took away from what you'd said and I just want to clarify. [¶] You handle claims every day. You handle Victaulic claims; right?

"[MS. FINBERG]: Yes.

"[MR. JEAN]: And we'll call that claims handling?

"[MS. FINBERG]: Okay, yes.

"[MR. JEAN]: Okay. And then you have—where you're testifying today, we have a litigation?

"[MS. FINBERG]: Yes.

"[MR. JEAN]: And that's a coverage litigation?

"[MS. FINBERG]: Yes.

"[MR. JEAN]: And it involves AIG and Victaulic in suit against each other about whether the policies cover the particular claims, the seven underlying claims; right?

"[MS. FINBERG]: Yes.

16

"[MR. JEAN]: Okay. So with that baseline understanding, we were talking about the potential for coverage; right? Now, do you handle the potential for coverage or make your assessments as a potential for coverage differently when you handle claims than as is done in this litigation?

"THE COURT: Do you understand the question?

"[MS. FINBERG]: I understand what he's asked, but it's hard to answer yes or no to that question, Your Honor.

"THE COURT: Do you use the same analysis to determine if there's coverage in your claims handling as you would in responding to questions in this lawsuit?

"[MS. FINBERG]: If it's yes or no, then I would have to say no.

"THE COURT: You don't?

"[MS. FINBERG]: If I could qualify that.

"THE COURT: You use a different analysis to determine coverage in coverage litigation as in claims handling?

"[MS. FINBERG]: May I—

"THE COURT: I'm just trying to get you to say yes or no. You'll be given plenty of opportunity to make your explanations.

"[MS. FINBERG]: Okay. I'll say no then.

"THE COURT: So the answer is no. Mr. Jean, the answer is no.

"BY MR. JEAN: . . . All right. So is the answer—I just want to make sure I'm clear. [¶] Do you treat the analysis for the potential for coverage as a claims handler the same as is done by AIG in connection with this litigation?

"MR. GOINES [counsel for the insurers]: Objection. Vague, Your Honor.

"THE COURT: Not vague.

"[MS. FINBERG]: No, not—no.

"BY MR. JEAN: . . . Okay. So—okay. You asked for an opportunity to explain.

"[MS. FINBERG]: Yes.

"[MR. JEAN]: Please explain.

17

"[MS. FINBERG]:  Thank you.  The claims handling I handle no matter what.  In these claims that you—the claims that are the subject of the litigation I've handled the same all along.  Nobody's asked me to change the way I handle the claims or make any decisions differently than I normally would because of this coverage litigation.

"[MR. JEAN]:  But then in connection with the litigation—

"THE COURT:  So how is it that your analysis is different if it's coverage litigation than if it's claims handling?  Isn't the potential for coverage based on the facts that you find by the plaintiff in the underlying case?  Isn't that where you get the concept of potential for coverage?

"[MS. FINBERG]:  In the underlying case, yes, that's correct.

"THE COURT:  So how is that analysis different in a coverage case?

"[MS. FINBERG]:  Because in this coverage litigation—

"THE COURT:  So what?  The facts are the facts, aren't they?

"[MS. FINBERG]:  We're taking a legal position in this coverage—

"THE COURT:  The facts of the underlying cases are the facts of the underlying cases.

"[MS. FINBERG]:  Yes, correct.

"THE COURT:  Is that right?  [¶]  And is it an analysis of the facts of the underlying cases that lead you to a determination of whether there's a potential for coverage?

"[MS. FINBERG]:  Yes.

"THE COURT:  And that's both in—wherever you are and whenever you are, that's the rule; right?

"[MS. FINBERG]:  That's correct.

"THE COURT:  Okay.  Good luck, Mr. Jean.

"MR. JEAN:  Thank you, Your Honor."

Brief questioning followed, counsel for Victaulic asking Finberg "what AIG is doing in litigation."  Finberg answered:  "The only thing I know about this litigation is involving the RFAs that I reviewed with counsel and signed."

18

The court said, "excuse me one moment," and there was a short pause in the proceedings, followed by this:

"THE COURT:   Ladies and gentlemen of the jury, before trial each party has the right to ask other parties to admit in writing that certain matters are true.  Those are called requests for admissions, RFA.  If the other party admits those matters, you must accept them as true.  No further evidence is required to prove them, okay?  I just wanted to read my usual instruction on discovery."

Victaulic's counsel said:  "Thank you.  I appreciate that.  Thank you, Your Honor."

There followed several pages of questioning by counsel for Victaulic, confirming that Finberg had been deposed as AIG's person most knowledgeable, and that AIG had decided to defend the claims.  Finberg also authenticated the individual insurer's responses to the RFAs, and acknowledged that she verified those responses.  And Finberg pointed out, the insurers' response:  " 'Deny' " was "after a series of objections."

Victaulic's counsel then asked a question beginning with his claimed confusion, leading to some brief questioning by counsel—and then questioning by the court.  This is how it all went:

"[MR. JEAN]:  So when you were—I'm a little confused because how is it that you could sign these under oath under penalties of perjury and deny the potential for coverage when you knew as a claims handler that there was the potential for coverage?

"[MS. FINBERG]:  I think I can clear up your confusion.

"[MR. JEAN]:  Yeah.  Please do.  I mean, that was an open-ended question, so go ahead.

"[MS. FINBERG]:  Okay.  Thank you.  These verifications, these requests for admissions were drafted and provided to me by coverage counsel, Mr. Eads' office.

"[MR. JEAN]:  Yes.

"[MS. FINBERG]:  These are legal documents.  I'm not an attorney.  I'm just an adjuster.  And I read them, and I reviewed them with Mr. Eads and his partners and was told, 'This is a legal position that we're taking in the coverage litigation.  We're

19

preserving legal issues. We're asking the Court for guidance, if you will.' [¶] It had nothing to do with the way I handled my claims. Nobody ever asked me to withdraw a defense or stop handling or change the way I was handling. I signed these as the person most knowledgeable, the legal position asking the Court for guidance.

"THE COURT: So you knew it was false when you verified it under penalty of perjury based on your own understanding of the underlying facts? Is that what you're telling us?

"[MS. FINBERG]: What was false, Your Honor?

"THE COURT: It's false that there was, in fact, a potential for coverage under all of those seven. You told us that already today. [¶] And what you're telling me is that you signed this under penalty of perjury, and you knew it was false?

"[MS. FINBERG]: No, Your Honor. This is not false. I was handling my claims because there was a potential for coverage under all those claims. But these verifications, RFAs, were legal positions that were being taken in this coverage litigation, so . . .

"THE COURT: So you knew that the underlying facts were that it was true that there was a potential for coverage, and yet you write in your verification that you declare under penalty of perjury that the foregoing responses are true and correct?

"[MS. FINBERG]: Right, because that was true and correct to the legal position that was being taken.

"THE COURT: Oh, okay.

"[MS. FINBERG]: So I wasn't being inconsistent.

"THE COURT: I understand now. The facts don't matter. [¶] Is that what you're telling me?

"[MS. FINBERG]: The facts don't matter in this litigation.

"THE COURT: All right.

"BY MR. JEAN: . . . So—

"THE COURT: May I see counsel in my chambers."

Following the session in chambers, the court returned to tell the jury, "we are going to take an early lunchtime today. We're going to come back at one o'clock, and

20

we are going to proceed. [¶] We'll have a different witness this afternoon, and we'll be dealing with things that are outside of your purview during that time, all right?" The court then discharged the jury, and requested Finberg to "step outside." She did, and this is what followed:

"THE COURT: The record will reflect that the jurors have departed the courtroom and the witness, Ms. Finberg, has stepped outside. [¶] Is there anything that either of the counsel wish to put on to the record?

"MR. GOINES: Not at this time, Your Honor . . . .

"THE COURT: All right. Well, I will try to summarize. We've had a conversation, counsel and I, in my chambers regarding the testimony of the current witness, and the admission that she perjured herself in her verification. [¶] And at the conclusion of our conversations, it was determined at Mr. Goines' request that the witness be allowed an opportunity to obtain private counsel and either take the Fifth Amendment and refuse to respond to questions or not. [¶] Consequently in our questioning we're going to have a different witness this afternoon starting at one o'clock, and Ms. Finberg will be back tomorrow at nine o'clock for continued examination." The court broke for lunch.

There is no record of the discussion in chambers. But when the parties returned to the courtroom, the insurers' counsel made a record of arguments the court had obviously already rejected, and Agelo Reppas, one of the attorneys for the insurers, moved for a mistrial. After brief argument, it was denied. This is the entire proceeding:

"THE COURT: All right. We're now on the record. The parties and counsel are present. The jurors are out of the room. [¶] Ms. Reppas is at the counsel table. [¶] You wish to address the Court?

"MS. REPPAS: Yes, Your Honor. Thank you. Based on what happened just before the lunch break, the defendants are moving for a mistrial based on the fact that the interactions in front of the jury, Your Honor's questioning of the witness and then going into chambers clearly conveyed to the jury that there was something serious, something was amiss, that Your Honor disbelieved the credibility of the witness, and that is not an

21

impression now that can be cured before the jury, so the jury has been irrevocably tainted by witnessing the events that took place right before the lunch break.

"Your Honor, we would also like to put on the record our objections to Your Honor's questioning of the witness in a manner that telegraphed to the jury that Your Honor disbelieved the witness, and that that is invading the exclusive province of the jury to determine the credibility of the witness, and now the jury has the impression that Your Honor disbelieves Ms. Finberg, and on that basis we'd also like to lodge our objection for the record.

"THE COURT:  All right.  So that's one motion, two bases?

"MS. REPPAS:  Well, Your Honor.  Sorry.  It's a motion for mistrial and also an objection on the same basis.

"THE COURT:  All right.  Do plaintiffs wish to respond?"

Victaulic's counsel responded with 12 lines of opposition.  The court then asked if the insurers' counsel had a reply.  This is what followed:

"MS. REPPAS:  Can I briefly respond, Your Honor?  [¶]  While the in-chambers discussion may be appropriate, it was done at such a point in time and in the middle of proceedings while the jury was still waiting that it clearly conveyed to them that something was seriously amiss, and it led—was right on the heels of—

"THE COURT:  And when should I have had that in-chambers conference? Tomorrow?

"MS. REPPAS:  No.  I'm not suggesting tomorrow.  I'm suggesting at the time— the jury witnesses all this, and the point here is, Your Honor, is that the jury cannot forget what it has seen, it cannot forget what it has heard, and it is tainted now.

"THE COURT:  All right.  The motion is denied, and the objection is overruled."

Mr. Goines, co-counsel for the insurers, asked for a brief adjournment, to address whether his law firm (Greenberg Traurig) could continue to represent the insurers based on Victaulic's intent to use the RFA responses prepared by his firm as a basis for impeachment of Finberg.  Counsel wanted to speak with his firm's general counsel.  And, he concluded, "I think our clients will be severely prejudiced, one, if they can go forward

22

with that discovery; two, if I can't get advice as to whether Greenberg Traurig should continue as counsel for the defendants on this case."

The next day, Finberg appeared with personal counsel, who advised the court that Finberg would assert her Fifth Amendment privilege against self-incrimination and refuse to testify further. In the course of discussion, counsel for Victaulic acknowledged that Finberg had "of course" waived the privilege as to "the topics she has answered the questions on." The court ruled that Finberg "will take the stand, will retake the stand, and the question will be posed to her." The court went on to note that it is a "difficult question to determine what areas of inquiry she may have waived her right to assert" the privilege, acknowledging that the court was "really . . . uncertain . . . with regard to the waiver question."

Later, in preparation for Finberg's retaking the stand, Victaulic's counsel again indicated his understanding that the privilege would be evaluated on a "particular question" by question basis. Following brief colloquy, the court said it did not want counsel "to go through his litany of questions and have every questions that he wants to ask and have her answer in the same manner to every one of them." That, the court said, would be "very wasteful of time."

The insurers' counsel requested that at the least the testimony be previewed in camera. The court refused. The insurers again moved for a mistrial, on the basis that, with Finberg's testimony cutoff midstream, it would be impossible for the insurers to rehabilitate her or give her an opportunity to explain her prior testimony. The court denied the motion.

Finberg resumed the stand and in the jury's presence broadly asserted a privilege not to testify to any substantive questions from either Victaulic or the insurers. And the court excused her. The insurers renewed their motion for mistrial. The court again denied it.

The above, we conclude, manifests several errors, beginning with the allowance of the RFAs into evidence.

**Requests for Admissions Are Not Admissible**

23

*Gonsalves v. Li* (2015) 232 Cal.App.4th 1406 (*Gonsalves*) involved an automobile accident. Plaintiff called defendant as an adverse witness and asked about his qualified denials of plaintiff's RFAs that he was responsible for the accident. And in closing argument, plaintiff emphasized that the denials were evidence defendant refused to take responsibility for plaintiff's injuries. (*Id.* at p. 1413.) The jury returned a verdict for plaintiff for $1,208,642.86. (*Id.* at p. 1411.) Our colleagues in Division Five reversed, holding it was error for the trial court to allow questions about RFAs.

The court first discussed analogous cases, including *Rifkind v. Superior Court* (1994) 22 Cal.App.4th 1255, holding that it was improper to ask at deposition " 'legal contention questions,' " which questions were condemned as requiring the party " 'to make a "law-to-fact" application that is beyond the competence of most lay persons.' " (*Gonsalves, supra,* 232 Cal.App.4th at p. 1415.) These concerns, the court concluded, "apply to the use of qualified denials to RFA's in the examinations here. Li was asked to explain 'by memory and on the spot' and without the ability to consult with his attorney why he took the legal position that he could not admit or deny certain RFA's without further inquiry. And he was asked to do this not in a deposition, as in *Rifkind*, but in front of the jury." (*Id.* at pp. 1415–1416.)

And the court went on to hold: "The weight of authority in other jurisdictions also favors Li's position. Massachusetts's highest court interpreted a statutory scheme similar to California's and concluded that denials to RFA's are not admissible evidence at trial: 'The purpose of [RFA's] is to narrow the issues for trial by "identifying those issues and facts as to which proof will be necessary." [Citation.] A denial . . . is not a statement of fact; it simply indicates that the responding party is not willing to concede the issue and, as a result, the requesting party must prove the fact at trial. [Citations]. The sanction for improperly responding to [RFA's] is the shifting of the award of incurred expenses[—see rule 36(a) of the Massachusetts Rules of Civil Procedure]. [¶] Further, [Massachusetts Rules of Civil Procedure, rule 36(b)], which governs [RFA's], does not specifically provide for the admission of denials in evidence. Although the rule states that admissions are conclusively binding on the responding party, it makes no parallel provision for the

24

use of a denial. By contrast, [Massachusetts Rules of Civil Procedure, rule 33(b)], governing interrogatories, states that the answers to interrogatories "may be used [at trial] to the extent permitted by the rules of evidence." The omission of a similar provision in rule 36(b) indicates that, although admissions have binding effect, denials do not have such an effect and cannot be introduced in evidence.' [Citation.] Therefore, the trial court 'incorrectly concluded that a denial of a request for admission is admissible as a prior inconsistent statement' to impeach a witness at trial. [Citation.]" (*Gonsalves, supra,* 232 Cal.App.4th at p. 1416, fns. omitted.)

Finally, *Gonsalves* noted that appellate courts in at least three states have similarly held that denials of RFA's are inadmissible at trial, citing to *Winn Dixie Stores, Inc. v. Gerringer* (Fla.Dist.Ct.App. 1990) 563 So.2d 814, 817; *Mahan v. Missouri Pacific Railroad Co.* (Mo.Ct.App. 1988) 760 S.W.2d 510, 515; and *American Communications v. Commerce North Bank* (Tex.App. 1985) 691 S.W.2d 44, 48.) (*Gonsalves, supra,* 232 Cal.App.4th at pp. 1416–1417.)

*Gonsalves* has a footnote that said this: "At least one court has held that such refusal may be relevant evidence of bad faith at trial in bad faith insurance cases," citing *Home Ins. Co. v. Owens* (Fla.Dist.Ct.App. 1990) 573 So.2d 343, 344 (*Owens*). (*Gonsalves, supra,* 232 Cal.App.4th at p. 1417, fn. 8.) Relying in part on that footnote, Victaulic contends that *Gonsalves* is distinguishable on two bases. First, the RFAs in *Gonsalves* were consistent with the witness's trial testimony, whereas the denials Victaulic used to cross-examine Finberg were "inconsistent" with her trial testimony and therefore admissible as prior inconsistent statements under Evidence Code section 780, subdivision (h). Second, *Gonsalves* carves out an "exception" for insurance bad faith cases. We disagree.

Evidence Code section 780, subdivision (h) provides that prior inconsistent statements are admissible "[e]xcept as otherwise provided by statute." California's discovery statutes address the use of RFAs and the sanction for improper denial. They do not authorize use of denials as evidence at trial. (See Code Civ. Proc., § 2033.410.) Indeed, holding RFA denials not admissible, *Gonsalves* cited with approval the

25

Massachusetts Supreme Court decision in *Gutierrez v. Massachusetts Bay Transportation Authority* (2002) 437 Mass. 396, where the Massachusetts high court expressly held that RFA denials were not admissible as prior inconsistent statements, reasoning that under Massachusetts's discovery statutes—statutes, as *Gonsalves* noted, similar to California's—RFA denials represent legal positions, not statements of fact.  (*Gonsalves, supra,* 232 Cal.App.4th at p. 1416.)

As seen from the transcript quoted above, this was precisely Finberg's position here:  she signed at the direction of the insurers' counsel when she verified the denials, responses that represented their "legal position."  In short, *Gonsalves's* holding that RFA denials are inadmissible does not rest on whether the denial is consistent or inconsistent with the trial testimony, but on the fact that RFA responses represent legal strategy.

As to the "exception" for bad faith cases, although *Gonsalves* stated that one court held that "such refusal may be relevant . . . at trial in bad faith insurance cases," the court did not endorse that rule, and noted that it "has been criticized as unfairly compromising a defendant's right to defend himself."[8]  (*Gonsalves, supra,* 232 Cal.App.4th at p. 1417, and fn. 8.)

---

[8] In fact, a close reading of the case *Gonsalves* cited in the footnote—*Owens, supra,* 573 So.2d 343—reveals that it does not even support the point for which it was cited.  In *Owens*, the insured claimed its insurer failed to settle his first party automobile claim in bad faith.  (*Id.* at p. 344.)  The opinion notes that the insurer denied coverage and bad faith in its pleadings, and denied coverage in its initial responses to RFAs, before later admitting coverage.  On appeal, the insurer argued the insured improperly attempted to cross-examine the claims handler using the insurer's pleadings.  The opinion provides no detail about how the insured attempted to use the pleadings, and does not indicate whether the insured even attempted to use RFA denials.  In fact, the opinion notes, "the insurer's pleadings in the case sub judice were, in the end, denied admittance."  (*Ibid.*)  Thus, while the court did generally state that litigation conduct was "relevant" to whether the insurer denied the claim in bad faith, the statement was apparently dictum, since the evidence was not admitted.

Moreover, the one case *Owens* cited for the proposition that litigation conduct was "admissible, relevant evidence" in bad faith cases does not even mention the use of any pleadings as evidence, much less RFA denials.  The case was *T.D.S. Inc. v. Shelby Mut. Ins. Co.* (11th Cir. 1985) 760 F.2d 1520, 1527, which involved an insurance claim for a

**The Interrogation by the Court Was Error**

The insurers assert that in addition to allowing use of the responses to RFAs, the trial court committed a series of prejudicial errors in how it handled Finberg, beginning with the argument that the court "improperly assumed the role of advocate and impugned Finberg's integrity before the jury." Describing the court's conduct with verbs and adjectives not generally seen in appellate briefs—at least not in briefs from respected counsel, which all three of the insurers' counsel are—the insurers assert that the trial court acted most inappropriately in the manner in which it questioned Finberg, "assuming the role of cross-examiner, questioning Finberg in a way that was overtly hostile and sarcastic,[9] and ultimately accusing her of perjury in front of the jury."

Victaulic's brief responds that "the trial court's questions simply attempted to clarify the seemingly contradictory evidence of Finberg's trial testimony and her verification of the RFA responses—the trial court's questions did not imply that Finberg perjured herself during her testimony at trial. The trial court did not belittle Finberg or express its views on the issue in the case." In addition to its claim of "clarif[ication]," Victaulic asserts, however halfheartedly, that what the trial court did here was "fair comment" under Article VI, section 10, of the California Constitution.[10] It also asserts that the jury was instructed that the court " 'ha[s] not intended by anything I have said or done, or by any questions that I have asked, to suggest . . . that I believe or disbelieve any

---

fire at the insured's restaurant. The insurer contended that the fire was arson and refused the claim. The entire discussion of the use of "litigation conduct" was about the fire investigation: "The gist of Shelby's complaint is that TDS was allowed, over objection, to attack the accuracy and adequacy of the fire investigation which Shelby asserted resulted in the denial of TDS's claim." (*Ibid.*) That, of course, has nothing to do with any pleadings.

[9] The brief makes accusations such as the trial court "mocked" Finberg and "ridiculed" her, and was overtly hostile and harsh.

[10] Which provides: "The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause."

witness.  If anything I have done or said has seemed so to indicate, you must disregard it and form your own opinion.' "

Victaulic's reading of the record is, we conclude, myopic, that any fair reading of the record reveals that the court acted in a way that from every indication was hostile to Finberg—and that it did not believe her.  It was error, error that could not be cured by a two-sentence instruction.

There is no question the trial court has the power to examine witnesses.  (Evid. Code, § 765, subd. (a); see *Estate of Dupont* (1943) 60 Cal.App.2d 276, 290.)  But, the Supreme Court has cautioned, in such examination the trial court cannot "become an advocate for either party or cast aspersions . . . upon a witness."  (*McCartney v. Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 533, overruled on other grounds by *Spruance v. Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 799, fn. 18.)  The reason, of course, is the significance of the court in the eyes of the jury, the influence it has.  Thus the admonition from long ago is still valid today:  a trial court "should exercise great caution in the examination of witnesses, lest by the nature or form of the questions asked he throw the weight of his influence to the one side or the other." (*People v. Silva* (1924) 67 Cal.App. 351, 357.)  In sum, any interrogation by the court must be "done with care," for if it is not, the jury might "because of the court's intervention, . . . alone, indulge in adverse inferences and conclusions . . . ."  (*People v. Robinson* (1960) 179 Cal.App.2d 624, 639.)

In *People v. Sturm* (2006) 37 Cal.4th 1218, the Supreme Court reversed the death penalty determination, ruling in part that the trial court committed misconduct by making disparaging comments directed toward defense counsel and defense expert witnesses, and by interposing objections to defense counsel's questions, leaving the overall impression that the court favored the prosecution.  Doing so, the court included this instruction:

"Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' (*People v. Zammora* (1944) 66 Cal.App.2d 166, 210.)  A trial court commits misconduct if it ' "persists in making discourteous and disparaging remarks to a

28

defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge." ' (*People v. Boyette* (2002) 29 Cal.4th 381, 460, quoting *People v. Mahoney* [(1927)] 201 Cal. [618,] 627.)" (*People v. Sturm, supra,* 37 Cal.4th at pp. 1237–1238.)

The trial court's questioning of Finberg here violated those principles—and was improper. While it is difficult to read inflection, or tone, or demeanor from a cold transcript, any fair reading of the transcript here lends support to the insurers' contention that the court "openly mocked Finberg on the stand, acting as an advocate for Victaulic." It began when Finberg attempted to explain the distinction between her role as a claims handler and the insurers' legal positions reflected in the RFA responses; the trial court apparently grew frustrated and intervened with the admonition to "[a]nswer his question." Two pages later was more of the same, telling her that Victaulic's counsel's question was a "yes-or-no question." Then, when Finberg said she was not sure she could answer with a simple yes or no, the court, apparently incredulously, said: "You don't know if you can answer that?" Two pages later, the court took over the questioning the first time, telling Finberg, "I'm just trying to get you to say yes or no. You'll be given plenty of opportunities to make your explanations." The court also asked Finberg to admit that the "facts are the facts, aren't they?" and then turned Finberg back over to Victaulic's counsel, remarking: "Good luck, Mr. Jean."

Before long, the court intervened again, acting as cross-examiner for Victaulic, in the colloquy quoted above, grilling her with questions including: "So you knew [the RFA denial] was false when you verified it under penalty of perjury based on your own understanding of the underlying facts? Is that what you're telling us?" Finberg responded with a question, to which the court said, "It's false that there was, in fact, a potential for coverage [for all of the underlying claims]. You told us that already today. [¶] And what you're telling me is that you signed this under penalty of perjury, and you knew it was false?" Finberg said: "This is not false. I was handling my claims because there was a potential for coverage under all those claims. But these verifications, RFAs, were legal positions that were being taken in this coverage litigation, so . . . ." The court

29

interrupted: "So you knew that the underlying facts were that it was true that there was a potential for coverage, and yet you write in your verification that you declare under penalty of perjury that the foregoing responses are true and correct?" Finberg answered, "Right, because that was true and correct to the legal position that was being taken. [¶] . . . [¶] So I wasn't being inconsistent." The court's interrogation ended with this:

"THE COURT: I understand now. The facts don't matter. [¶] Is that what you're telling me?

"[MS. FINBERG]: The facts don't matter in this litigation."

Such conduct, we conclude, was misconduct, as it was in other cases that were reversed based on such misconduct alone. (See, for example, *People v. Sturm, supra,* 37 Cal.4th at p. 1243; *People v. Mahoney, supra,* 201 Cal. at p. 627; *People v. Perkins* (2003) 109 Cal.App.4th 1562, 1571–1572; *People v. Williams* (1942) 55 Cal.App.2d 696, 702–703; *People v. Earl* (1935) 10 Cal.App.2d 163, 166.)

But there is much more here than just this misconduct—several errors in the trial court's handling of Finberg's invocation of the Fifth Amendment privilege.

### The Trial Court Erred in Its Handling of Finberg's Invocation of the Privilege Against Self-Incrimination

The insurers contend that the trial court erred in four separate ways in how it dealt with Finberg's invocation of the privilege: (1) allowing her to invoke her privilege after she had already testified under Victaulic's questioning for nearly two days, (2) allowing her to unilaterally invoke the privilege on a blanket basis, (3) failing to either strike Finberg's testimony or declare a mistrial, and (4) requiring Finberg to invoke the privilege in front of the jury.

Victaulic's response does not come to grips with most of the insurers' arguments, beginning its response with the assertion that "AIG ignores that it has waived most of its various claims of error." Passing over that waiver of "most" is not waiver of all, we begin with Victaulic's claim of waiver—and conclude it has no merit.

To begin with, most of the errors which the insurers assert on appeal were decisions the trial court made sua sponte. Thus, for example, the trial court twice

30

interrupted Victaulic's questioning of Finberg and began interrogating her itself. Then, dissatisfied with her answers, the court halted the proceedings in the middle of Finberg's testimony and ordered counsel to chambers. None of these actions was requested by Victaulic, so the insurers had no opportunity to interpose an objection before the court acted.

There is no record of the discussion in chambers. But when the parties returned to the courtroom, the insurers' counsel made a record of arguments the court had obviously already rejected, and "based on what happened just before the lunch break," moved for a mistrial "based on the fact that the interactions in front of the jury, Your Honor's questioning of the witness and then going into chambers clearly conveyed to the jury that there was something serious, something was amiss, that Your Honor disbelieved the credibility of the witness, and that is not an impression now that can be cured before the jury, so the jury has been irrevocably tainted by witnessing the events that took place right before the lunch break."

In short, the insurers' counsel clarified that the insurers were moving for a mistrial and also objecting to the court's questioning of the witness, and to the court's having telegraphed its disbelief of Finberg's testimony. And when counsel noted the court's abrupt decision to halt the proceedings and demand a "chambers" conference, the court interrupted counsel midsentence with this: "And when should I have had that in-chambers conference? Tomorrow?" The court then ruled: "All right. The motion is denied, and the objection is overruled."

The next day, when Finberg returned with her personal counsel to assert the privilege, the insurers renewed their motion for mistrial. Counsel again objected to the court's handling of the matter, specifically noting two critical points: first, it was wrong to make Finberg invoke the privilege in front of the jury; and second, that it was unfair to allow Finberg to invoke the privilege in the middle of her testimony without giving the insurers an opportunity to question her. Counsel also asked the court to recuse itself based on its improper treatment of Finberg. The court rejected these arguments,

responding: "Well, let me stop you right there. I think that you're completely wrong about the facts that are underpinning that, and I will not recuse myself."

When Finberg's personal counsel appeared, the trial court told him that it had essentially made up its mind how to proceed: "All right, Mr. Nedeau. But I will tell you that my perception of how to proceed in this unusual circumstance is that your client will take the stand, will retake the stand, and the question will be posed to her."[11] The insurers' counsel again noted it was fundamentally unfair to allow Finberg to assert her privilege mid-testimony. The court responded indifferently: "Every litigant is prejudiced in every case about a testimony or the lack of testimony from one witness or another." Counsel persisted, and again attempted to explain the insurers' objection: "We're in the middle of a critical witness who handled six of the seven underlying claims at issue in this case, and now we can't put on any evidence to present our side of the story and to rehabilitate her? That is severely—that's preventing us from having a fair trial." Without further explanation, the court denied the motion.

Later that day, when Finberg was ready to resume the stand, the insurers' counsel noted the trial court had already determined Finberg would invoke the privilege in the presence of the jury.[12] Victaulic's counsel attempted to assert that the defense had acquiesced in this procedure, but the insurers' counsel disagreed: "Well, we would request it [i.e., that Finberg be questioned outside the presence of the jury], but I understand it's going to be denied." Then, after Finberg took the stand, the insurers again renewed the motion for mistrial, "in light of the fact that we will not be able to rehabilitate Ms. Finberg." The court responded: "It's denied."

---

[11] In the course of this discussion, the trial court denied having accused Finberg of perjury. Finberg's counsel responded by a reading a portion of the transcript where, he claimed, the trial court had done just that.

[12] When Finberg's personal counsel stated that Finberg will "take the Fifth [on] all substantive questions from either side after she invokes it," the trial court added: "Either side and me too, I'll bet." The transcript reflects that Finberg's personal counsel "[n]ods head up and down."

In sum, the insurers' counsel repeatedly objected to the trial court's handling of Finberg—its interrogation of her, its decision to halt her testimony, and its decision to require Finberg to invoke the privilege in front of the jury. And they repeatedly requested a mistrial. The insurers made their position clear every step of the way.

### *Waiver*

In *People v. Williams* (2008) 43 Cal.4th 584, the Supreme Court discussed the issue of waiver of the privilege against self-incrimination, saying this: "A nonparty witness may elect to waive his or her privilege against self-incrimination. In addition, in some instances a waiver may be implied when a witness has made a partial disclosure of incriminating facts. 'It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details. [Citation.] The privilege is waived for the matters to which the witness testifies, and the scope of the "waiver is determined by the scope of relevant cross-examination." [Citation.]' (*Mitchell v. United States* (1999) 526 U.S. 314, 321 . . . .)" (*People v. Williams, supra,* at p. 615.) In other words, notwithstanding the significance of the privilege, a witness is subject to cross-examination on topics on which he or she has already testified. As we tersely put it in *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735, "the right to cross-examination cannot be defeated by a valid claim of privilege, even a privilege as strong as that embodied in the Fifth Amendment."

"[T]he waiver rule 'rests primarily . . . on the need to avoid leaving triers of fact with the limited version of relevant information that would be before them if a witness was permitted to at will pick a point at which to invoke the privilege.' " (*People v. Williams, supra,* 43 Cal.4th at p. 616, quoting 1 McCormick on Evidence (6th ed. 2006) § 133, p. 562.) This would undermine the integrity of the fact finding process, as it would mean that only one party could question a witness, giving that party an unfair advantage. (*Mitchell v. United States, supra,* 526 U.S. at pp. 322–323.)

That unfairness was present here. Victaulic was allowed to examine Finberg. The insurers were not. This was error, an error that Victaulic itself noted—indeed, perhaps the court itself, admitting it was "really . . . uncertain" as to the waiver issue. The court

nevertheless ruled as it did, allowing Finberg's testimony to remain in the case without more, to devastating effect.[13]

### The Blanket Claim of Privilege

The insurers also contend that it was error for the trial court to allow Finberg to invoke the privilege on a blanket basis. We agree, as we ourselves have held, in *Warford v. Medeiros* (1984) 160 Cal.App.3d 1035, 1045. There, following an exhaustive discussion of the privilege, and citing numerous state and federal cases, we concluded as follows: "For the reasons set forth in the federal case law, we hold that a blanket refusal to testify is unacceptable; a person claiming the Fifth Amendment privilege must do so with specific reference to particular questions asked or other evidence sought. We hold, additionally, that once this is done, the trial court must undertake a particularized inquiry with respect to each specific claim of privilege to determine whether the claimant has sustained his burden of establishing that the testimony or other evidence sought might tend to incriminate him." (See also *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1053; *Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 308; *Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 428.)

Moreover, Finberg could invoke the privilege only as to testimony that would furnish a " 'link in the chain' " of a perjury charge. (*Warford v. Medeiros, supra,* 160 Cal.App.3d at p. 1043.) Without analyzing whether there was any real likelihood

---

[13] As we said in *Fost v. Superior Court, supra,* 80 Cal.App.4th at pp. 735–736, fn. omitted: "Where a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony on direct. As stated in Witkin: 'In either a civil or criminal case, where a party is deprived of the benefits of cross-examination of a witness by *refusal of the witness to answer*, the trial court may *strike out the direct examination*. [Citations.]' (3 Witkin, Cal. Evidence, [(3d ed. 1986)] § 1877, p. 1831.) This rule applies even 'where the refusal to answer is based on a valid claim of privilege.' (*Ibid.*) Where a witness refuses to submit to proper cross-examination regarding material issues, the striking out or partial striking out of direct testimony is common . . . . Striking a witness's entire testimony is, of course, a 'drastic solution,' only to be employed 'after less severe means are considered.' [Citations.]"

34

Finberg committed perjury,[14] such risk related at the most to the responses to the RFAs. But Finberg's testimony to Victaulic's counsel covered much more than just the RFAs, and questioning of her by the insurers' counsel would have addressed other relevant subjects, including how she handled the claims.

This ruling, too, was error.[15] But perhaps the most egregious error was yet to come, making Finberg invoke the privilege in front of the jury.

### *In the Presence of the Jury*

As indicated, the trial court determined that Finberg would "retake the stand" and invoke the privilege in front of the jury. This ruling is hard to comprehend, in light of the authorities, beginning with this court's holding in *People v. Johnson* (1974) 39 Cal.App.3d 749, 757. As the Supreme Court has put it: "Allowing a witness to be put on the stand to have the witness exercise the privilege before the jury would only invite the jury to make an improper inference" from the invocation of the privilege. (*People v. Frierson* (1991) 53 Cal.3d 730, 743; *People v. Holloway* (2004) 33 Cal.4th 96, 130 ["having the witness exercise her privilege in the jury's presence would be 'in direct violation of Evidence Code section 913' "[16]]; *People v. Richardson* (2008) 43 Cal.4th 959, 1011.)

As one Court of Appeal summed up: "Once a court determines a witness has a valid Fifth Amendment right not to testify, it is, of course, improper to require him to

---

[14] Perjury requires that the witness make a willful statement that he or she knows to be false. (*People v. Garcia* (2006) 39 Cal.4th 1070, 1091.) As the extensive testimony quoted makes clear, Finberg did not prepare the responses to the RFAs. She signed what the attorneys prepared in connection with the litigation, and did not believe it was false.

[15] Victaulic argues "invited" error in connection with this claim, based on the insurers' counsel's summary of his understanding of how Finberg's testimony would be handled. But such summation was only after it was clear the trial court planned to allow Finberg, through personal counsel, to decide unilaterally whether the privilege applied and to assert the privilege as to all questions.

[16] Evidence Code section 913 states that it is impermissible for the jury to draw an inference from a claim of privilege regarding "any matter at issue in the proceeding," and that any "party who may be adversely affected" by such an inference is entitled to a remedy.

invoke the privilege in front of a jury; such a procedure encourages inappropriate speculation on the part of jurors about the reasons for the invocation. An adverse inference, damaging to the defense, may be drawn by jurors despite the possibility the assertion of privilege may be based upon reasons unrelated to guilt. These points are well established by existing case law. (See, e.g., *People v. Mincey* [(1992)] 2 Cal.4th [408,] 441.)" (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554.)

Victaulic suggests that because the privilege belonged to Finberg, it was up to her whether to assert it in front of the jury, and the insurers cannot complain about her choice. Here, however, Finberg did not make a choice. The trial court "chose" for her. Victaulic also asserts the trial court has discretion to force a witness to invoke the privilege in the jury's presence, citing *Warford v. Medeiros, supra,* 160 Cal.App.3d at p. 1048. But we said there only that the trial court has discretion to require the witness to invoke the privilege "in open court" rather than in camera. "[I]n open court" does not equate with "in front of the jury."

That, then, is the setting vis-à-vis critical witness Finberg: her attempt to explain how she came to verify the RFAs prepared by counsel twice interrupted by the court, the second time injecting itself into the proceedings with aggressive, it not hostile, examination; abruptly stopping the testimony for the in-chambers session where the court stated that Finberg had "made an admission that she perjured herself"; as much as compelling her to invoke the privilege in front of the jury; and then simply excusing Finberg from testifying further, denying the insurers any opportunity to rehabilitate her, or even ask her to explain or clarify her answers.

Beyond that, the trial court allowed Victaulic to exploit the Finberg situation throughout the rest of the trial, including, for example, allowing this question of Van De Voorde, Victaulic's chief legal officer: "Q. [by Mr. Jean]: [W]hen you heard Ms. Finberg tell us that she lied on the request for admission, what impact, if any, did that have on you?" Over objection, Van De Voorde replied, "I'm both personally and professionally shocked and disgusted. . . . [W]e're here as a result of what I would consider to be some pretty egregious and malicious conduct by AIG." That was

36

improper. (*People v. Riggs* (2008) 44 Cal.4th 248, 318; *People v. Melton* (1988) 44 Cal.3d 713, 744.)[17]

But the real impact of the Finberg situation was yet to come—in closing argument.

### *Victaulic's Closing Argument*

Early in Victaulic's closing argument, counsel referred to Finberg's response that she opened some claim files because she was told to by Taylor, that she was just " 'doing what [she was] told.' " And then counsel said this:

"Zero basis to open this. And she just does it anyway. Ms. Finberg had more than 35 years of experience in the business. She ran the fraud investigation unit at Sequoia. She knew exactly what she was doing. Incredibly, it didn't stop there. Because what happened after that? AIG decides it's going to lie on the RFAs.

"Remember, these are requests for admission. These are documents that are submitted under oath, penalties of perjury. They are designed to help parties narrow the issues in dispute. They are required under the law to answer these truthfully.

"And how did they respond? Forty, more than 40 times, how did they respond? You walked through these with Mr. Van de Voorde. I'm not going to go through all of them with you today. But deny. Admit the potential for coverage under one or more of the insurance policies. Deny. [¶] . . . [¶]

"So they send Ms. Finberg out. They authorize her. She says, 'I'm the chief of PMK,' and that, if you remember, is the person most knowledgeable. That is a very important person in the litigation process. It is someone who is authorized by the defendant or by the plaintiff. . . . The person authorized by the company to testify under oath, penalties of perjury, and give their response. And you heard her say she was the PMK on these RFAs.

"Now, this is a long way of getting to AIG breached the contracts. I'm going to walk through the verdict form in a few minutes. But they breached it. They knowingly

---

[17] Victaulic's expert witness, an expert only on the *Brandt* attorney fee damages issue, testified that Finberg's testimony evidenced "trick[ery] and decei[t]."

breached it. They fraudulently breached it by lying, and they did it in bad faith, ladies and gentlemen."

Victaulic's counsel then moved to the verdict form, saying that he couldn't "possibly hope to summarize it all today. We'll be here for several days." But he did "walk through" it, and following discussion on the "breach of contract" question, said the jury must move to question Nos. 2 and 3, damage caused by the breach, which he would try to "summarize." And, he said, the "easiest place . . . to look is Exhibit 1267, because that summarizes all in one place the monetary component of that harm."

The argument then turned to question No. 4 on the verdict form, bad faith. After reading from a portion of CACI No. 2337, off counsel went, with the "lies," the "subterfuges and evasions." This was it:

"Subterfuges and evasions. That's what we have heard about over the last three weeks. Conduct that does not comply with community standards of decency, fairness and reasonableness. We heard a lot about that, too.

"During my opening, I said, 'These are the very lessons that we teach our children. The rules that we all try to live by.' Keep our promises, act fairly and honestly. And perhaps most importantly, don't lie.

"You'll recall that AIG lied in over 40 of its responses, requests for admission. Important documents that AIG fraudulently used to perpetuate this litigation, even though its claims handlers knew the response was wrong. Important documents that AIG used to fraudulently deny Victaulic policy benefits.

"Now, AIG seems to suggest that that was okay, and its lies are okay as long as we had a reason for it, and as long as there was an explanation to why we lied. Now, these, of course, are the requests for admission. There's a stack of them. We all know Ms. Finberg verified them with the authorization."

Then, after a brief description of a request for admission, and that Finberg verified them, counsel said this:

"How did you verify under penalty of perjury interrogatory responses that point to a document you had never seen before, you don't have any knowledge of?  You don't.  Another lie.

"This is the type of conduct that complies with these community standards of decency, fairness or reasonableness, or is it just subterfuge or evasion?  I submit the latter.  And it is this type of despicable conduct that screams out bad faith.  It's AIG's lies and misrepresentations to Victaulic and the courts that cause Victaulic to incur more than $10 million in fees to get here today before you.  And asking you to render a verdict in our favor.

"Now, you heard Jim Schratz.  Done a lot of claims handling.  He testified that this is one of the worst cases of bad faith—well, he didn't use bad faith.  He said one of the worst cases in the industry he had ever seen, top five.  And this is the guy who has seen it all."  There were "lies in the coverage positions," counsel went on, three pages later referring to the RFAs "[u]nder oath, penalties of perjury."

Turning then to the claim for damages from the claimed bad faith, counsel referred to exhibit No. 1179, Schratz's expert witness summary, arguing that what Victaulic seeks is an award, "I'm rounding, $8.25 million in fees."  The actual amount in the summary was $8,232,677.68.

The argument concluded with the issues regarding punitive damages, and CACI instruction No. 3946.  It was a "long" instruction, counsel said, and he was "not going to go through all of it here."  But summarizing a few paragraphs, beginning with: "Conduct.  Malice, oppression or fraud," this is what counsel said:

"So let's look at these, and we'll look at the conduct you saw throughout the case.  But first, let's focus on the conduct.  Malice.  What does 'malice, oppression' mean?  It's in your jury instructions.  Not words that we commonly use.  But malice and oppression.  Despicable conduct.  Knowing disregard for someone else's rights.  Fraud.  Intentional misrepresentation or concealment of a material fact plus an intent to harm.

"We have that here.  Both of these.  AIG's lying on the RFAs, lying on the interrogatories is despicable under any measure.  Under oath, penalties of perjury.  They

39

know what they are doing.  They lied.  And they did it with complete disregard for the law and for Victaulic's rights.  Not only, though, do those constitute, those RFAs, the interrogatories, do they constitute malice and oppression.  It's fraud.  It is fraud.  They knew what they were doing and they intentionally misrepresented the facts.

"You heard Ms. Finberg.  The facts don't matter in litigation.  The facts don't matter.  It's the only witness that said that. . . . [18]

"Now, one of the things that in retrospect, when I was thinking about the cross-examination of Ms. Finberg, I was thinking, okay.  So you're wearing your claim adjuster hat and you're wearing your litigation hat.  And you know what?  There's not two hats.  There's not two hats.  There's one hat.  You get to tell the truth.  You have to tell the truth.  She knew it.  She signed the request for admission.  She was authorized to do so.  AIG knew and they let her do it.  They made her do it.  And that is despicable.

"And I think I personally felt a sense of disgust when I, at that moment when I realized she admitted to lying.  That's something that just doesn't happen.  Shouldn't happen.  Shouldn't happen in documents and shouldn't happen in business and shouldn't happen in our everyday lives.  Certainly not on—certainly under oath.  Certainly not under penalty of perjury.  Certainly not by someone who ran a fraud investigation unit and knows better.

"Was it intentional?  Absolutely, absolutely.  Ms. Finberg testified.  Her attorneys told her, 'This is the legal position we are taking in the coverage position,' and she continued.  Nobody ever asked me to withdraw a defense or stop handling or changing the way I was handling.  I signed these as the person most knowledgeable.  The legal position asking the courts for guidance.  Asking the courts for permission while lying about it.  That is just not right.

"AIG would not change its position in any of the underlying matters based on the facts until it was forced to do so, and then in litigation, rather than relying on the facts, it falsified the facts.  It falsified the requests for admission and it falsified the interrogatory

---

[18] "[F]acts don't matter," it will be recalled, were the exact words of the court's last question to Finberg before the court halted her testimony.

responses.  We went through all the other ones that she responded to.  All 40 of them.  And those are all examples of malicious, oppressive and fraudulent acts."

Victaulic's final argument was, as he promised, "extremely brief," three pages to be exact.  It began this way:

"Yes.  Thank you, Your Honor.  I'll be extremely brief.  Mr. Goines had a quite shining presentation, very impressive.  But if you scratch a little bit under the surface, you will see that it is based upon—virtually entirely upon lies and misrepresentations.

"And I know that you sat here through three and a half weeks of trial.  It was actually quite difficult for me to listen to because of that.  The lies and the misrepresentations.  But you sat here for three and a half weeks.  You listened to the testimony.  You heard the evidence.  You saw the evidence.

"And I'm not going to go over everything.  I'm not going to show you what he misrepresented.  I'm going to leave it to you to find the truth for yourself.  Because it is there.  But I do want to say one thing.  Mr. Goines, AIG is asking for you to look at reasonableness under a lens that lies are reasonable.  Lying under oath on more than 40 RFAs, requests for admission that could have brought this case to an end a year ago.  That is okay.  And if that is the standard, then everything they did, everything is reasonable.  And that is just not acceptable."

**The Verdict**

Closing arguments concluded in the afternoon of July 29, followed by the concluding instructions, and the matter was in the hands of the jury.  The jury began deliberations at 3:42 p.m. and recessed at 5:00 p.m.  The next day, July 30, the jury deliberated from 9:00 a.m. to 12:00 p.m., and from 1:15 p.m. to 2:40 p.m., at which time it announced it had a verdict.  So, following a three and one-half week trial, the jury deliberated for some five hours.  It asked for no readback.  It asked no questions of the court.  It asked for no clarification of any instruction.  No, after such short deliberation, the jury returned a verdict that went absolutely down the line with Victaulic, awarding the exact amounts argued by Victaulic.

41

Finally, the jury had to grapple with the issue that underlay the possibility of punitive damages, the questions of "malice, oppression or fraud" and whether a managing agent was involved, which had to be proved by "clear and convincing evidence." This was, in the words of Victaulic's counsel quoted above, the "long" instruction, the insurers' counsel calling it the "difficult, complicated" question. The jury answered those questions too for Victaulic. All this in over five hours. After three and one-half weeks. Right down to the penny for Victaulic.

Phase 3, the punitive damages case, was more of the same. The issue was "tried" on stipulation, with counsel then arguing based on that stipulation, arguments that, including a break, lasted barely over an hour. Victaulic's counsel argued somewhere between "40 and a half to $50 million" was appropriate. The jury awarded $46 million—right in between.

There is no question that the closing argument can play a significant role in assessing whether error was prejudicial. (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 26–27.) As described in detail above, Victaulic's argument was Finberg, Finberg, Finberg; RFAs, RFAs, RFAs; her lies, lies, lies; and plenty of "penalty of perjury." Countless times Finberg's name and those terms were mentioned, culminating in the argument that ultimately led to the punitive damages: "[M]alice and oppression. Despicable conduct. . . . [¶] We have that here. . . . AIG's lying on the RFAs, lying on the interrogatories is despicable under any measure. Under oath, penalties of perjury. They know what they are doing. They lied." Lest the jury miss the point, Victaulic's counsel added that he "personally felt a sense of disgust when I, at that moment when I realized she admitted to lying. That's something that just doesn't happen. Shouldn't happen. Shouldn't happen in documents and shouldn't happen in business and shouldn't happen in our everyday lives. . . . Certainly not under penalty of perjury."

The series of trial court errors in handling Finberg's testimony, coupled with Victaulic's exploitation of those errors in closing argument, surely influenced the bad faith verdict, especially as the vote was nine to three. (See *Robinson v. Cable* (1961)

42

55 Cal.2d 425, 428 ["The fact that only the bare number of jurors required to reach a verdict agreed upon the verdict" lends support to finding of prejudice]; *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 665 [10-to-two verdict was "close"].)

Superimposed on the above is that there were multiple errors which, as our colleagues have put it, is significant in and of itself: "Without attempting to analyze separately these issues of prejudice, we conclude that the cumulative effect of the errors was unquestionably to make it 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error[s].' " (*Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141; see *Delzell v. Day* (1950) 36 Cal.2d 349, 351 [cumulative comments by trial court].) Likewise here.[19]

## DISPOSITION

The judgment is reversed. The insurers shall recover their costs on appeal.

---

[19] In light of the result we reach, we need not discuss the other issues raised by the insurers, including the claims that there was error in the instructions; that the *Brandt* attorney fees in bad faith are not supported by substantial evidence, and in any event are excessive; and that the $46,000,000 punitive damage award is "unsupported, excessive, and unprecedented."

                        _____

                        Richman, Acting P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.


A146617; *Victaulic v. American Home Assurance Co.*

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Frank Roesch

Counsel:

Pillsbury Winthrop Shaw Pittman, Joseph D. Jean, Kevin Murray Fong, Colin T. Kemp, Clark T. Thiel for Plaintiff, Cross-defendant and Respondent.

Horvitz & Levy, Peter Abrahams, Mitchell C. Tilner, Emily V. Cuatto; Riordan & Horgan, Dennis P. Riordan, Donald M. Horgan; Law Offices of Doron Weinberg and Doron Weinberg for Defendants, Cross-complainants and Appellants.