Filed 7/27/21  P. v. Bulls CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077170 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE384442) |
| SHONNEL RASHAWN BULLS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lantz Lewis and John M. Thompson, Judges.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

Shonnel Rashawn Bulls elected to defend himself against residential burglary and petty theft charges.  But at the hearing immediately before his

trial was scheduled to begin, he asked for counsel to be reappointed. After a lengthy and sometimes blunt colloquy regarding the reasons for Bulls's last-minute change of heart, Judge Lewis granted the request for appointment of counsel, which delayed the trial and ultimately resulted in the case being reassigned to Judge Thompson.

A jury trial resulted in guilty verdicts on both charges. Bulls now argues on appeal that certain comments made by Judge Lewis disparaged his abilities and coerced him into giving up his right to represent himself. But Bulls himself made it clear that he wanted counsel appointed because he did not understand the law well enough to try his own case. And while Judge Lewis's comments were frank and occasionally harsh, they were not coercive. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Familiarity with different aspects of Bulls's underlying case, the testimony at his trial, and his motion hearings are required to understand the full context of his arguments. We recite this history accordingly.

1.    *The Burglary*

One night in July, the manager of the Budget Inn Motel observed a man peering into a car in the motel parking lot. After speaking to him and confirming he was not a guest, the manager asked him to leave. The man complied, but returned a few minutes later with a second man, prompting the manager to call the police. The two men were then briefly interviewed by officers from the El Cajon Police Department, one of whom was Officer Hannibal, and the contact was captured on their body worn cameras (BWC). Bulls identified himself by his name and birthdate, while the other man gave the name of Jeremiah Williams.

About a half hour later, two men entered an occupied room at the nearby El Cajon Suites. A security camera recorded the entry. The men were wearing the same distinctive outfits that Williams and Bulls wore earlier that night as captured on the BWC footage. They took personal items of two victims and then left the scene.

An image from the security footage was circulated to El Cajon police officers to see if anyone recognized the two men. This caused Officer Hannibal to reach out to Officer Howard, who was investigating the burglary. Howard compared the BWC footage from earlier that night at the Budget Inn with the surveillance video from the El Cajon Suites and saw the same men on each. As he described it, they were "wearing the exact same clothing, [with] the exact same backpacks, all the way down to the same watch on the wrist."

Although Bulls identified himself on the BWC footage, Howard apparently wanted to confirm that this was his real name, so he designed a ruse to get Bulls to talk to him. In that conversation, Howard asked Bulls to help him with an unrelated, fictitious matter. Bulls explained that he knew the area near the Budget Inn Motel and remembered being contacted by officers around the time of the burglary.

Bulls was charged with residential burglary and petty theft based on the El Cajon Suites incident. At his trial, Howard identified Bulls from their personal contact, and testified he was certain Bulls was one of the men from the surveillance video. Bulls testified on his own behalf. He acknowledged his contact with officers at the Budget Inn and admitted that he entered the room at the El Cajon Suites, but claimed Williams had tricked him and denied participating in any burglary. Bulls was subsequently convicted of both crimes.

2.     *Bulls's Representation and Pretrial Motion Hearings*

From the very outset, the issue of Bulls's representation was fraught with difficulty. The public defender was appointed as counsel, but at his arraignment before Judge Amador, Bulls requested a *Marsden*[1] hearing. He talked at length during the hearing, relaying a broad range of concerns—only some of which pertained to his counsel's performance. At various times, he tested the patience of the court, interrupting Judge Amador more than once—and ultimately earning admonitions to "be quiet for a minute" and "quit talking." Before denying the *Marsden* motion, Judge Amador commented that it was "clear to the court that Mr. Bulls has a problem listening and understanding." Bulls contested this point, and then asserted that he wanted to act as his own attorney.

After the *Marsden* hearing concluded, Judge Amador provided some gentle but firm advice to Bulls about the perils of representing himself. He relayed "an old saying [that] 'it is a fool who has himself for a client,' " and asserted "there's a reason for that [saying], okay?" Later on, he told Bulls it was "always unwise to exercise [the] right" to self-representation and, after describing the particular disadvantages that Bulls would face, he left Bulls with one piece of advice before granting his request:

> "Here's the thing. You're going to be moving forward in this case. At some time, you're going to be progressing through this. If you feel that you are overwhelmed, if you feel that you've made a bad decision, all right, there is no shame, and we often have pro pers who—when, at the end of the day, week, or month, say to themselves 'I think I made a bad decision,' but their pride puts themselves in a position that they don't want to change; then if you make that decision, then let the court know, and then the court will make other arrangements."

---

1      *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

4

In the following months, Bulls acted as his own attorney and filed several motions that evidenced both his dedication to his case and his misunderstanding of the law. He requested discovery of items he was not entitled to, and seemed to be under the impression that the People were obligated to disclose in detail how they planned to put on the case in order to assist Bulls in preparing a defense.

It is clear from these pretrial motion transcripts that Bulls's frustration mounted as the trial date approached and he felt he had not been treated fairly. While a minority of his complaints might have had merit, his difficulties were augmented by the challenges of proceeding in propria persona while he was incarcerated and Bulls's personal opinions about how the law should work—notably, that there was no probable cause to hold him, and that if the prosecution failed to ensure he had versions of every item he thought was discoverable in formats that would enable him to easily review them from jail, the court should sanction the prosecution and even suppress evidence. As in his *Marsden* hearing, Bulls struggled to conduct himself appropriately, interrupting judges he appeared before, insisting on his view of the issues, and labeling decisions that he did not like "biased and prejudicial."

By the time he appeared before Judge Lewis on the day his trial was set to begin, these dynamics were rather entrenched. Bulls had filed several pretrial motions, and continued to focus on discovery information he thought he had received late—some of which was only provided to him as a courtesy. At several points, Judge Lewis paused the discussion to make sure Bulls understood what was happening and why, explaining the proper time to argue particular motions, how burdens of proof shift, and legal concepts like relevance. During these early exchanges, Judge Lewis struck a respectful

tone, recognizing that Bulls had "done a lot of hard work" to prepare for his case but also explaining that he misunderstood some aspects of the law. Over time, these educational interludes became somewhat tense. Bulls interrupted Judge Lewis and repeated himself at length, which eventually prompted Judge Lewis to break into Bulls's soliloquy to say the following:

> "Okay. Mr. Bulls, we're going to stop because it's apparent that you're not a trained attorney. It's apparent that you don't know how evidence unfolds in trial. It's apparent you don't know what's relevant and not relevant. It's apparent you don't know that at a preliminary hearing the People don't have to present all the evidence. It's apparent that you're at a real disadvantage because you're representing yourself, and I'm done because you keep on saying the same thing over and over and over again."[2]

Judge Lewis then explained again why the discovery issues Bulls remained focused on would not help him mount an effective defense and attempted to move on to jury selection. In response, Bulls raised an issue they had already discussed—his request to suppress his statement to Howard confirming he was contacted by Hannibal because Bulls was allegedly tricked into speaking with Howard and thus not properly Mirandized. Judge Lewis explained that even though he had conditionally ruled in Bulls's favor on that motion, the result of that ruling would not lead—as Bulls apparently thought—to the suppression of the BWC footage in which Bulls identified himself and wore the same outfit later seen on one of the figures in the

---

[2] Judge Lewis made these comments in response to Bulls's apparent assertion that the People could not introduce any evidence at trial that they had not presented at his preliminary hearing, his position that the BWC evidence was irrelevant to his case, and his fixation on when certain evidence was provided to him—which Judge Lewis had already explained amounted to a "technical" discovery violation but not a substantial violation of his rights.

surveillance video.  After this discussion, Bulls asserted that he now wanted the court to appoint a lawyer to represent him.

Judge Lewis responded that he thought Bulls was only asking for an attorney because he did not like the rulings on his motions and was attempting to game the system.  Bulls contested this characterization and asserted he wanted an attorney because "I don't understand the law, your honor, so I don't think I should represent myself."  Judge Lewis pushed back more than once, asking again if his adverse rulings on Bulls's motions motivated this change.  Bulls explained that he wanted an attorney because the rulings made him realize his understanding of the law was flawed.  He also implied that Judge Lewis's rulings were biased, but he stated no fewer than three times that he wanted an attorney because he did not understand the law.  Bulls ultimately summed up his request in these terms:  "What I'm saying is I can't adequately represent myself because my interpretation of the law is wrong.  So I don't believe that's a fair trial for me to go to trial.  Like you said, your honor, I'm not a lawyer, and you say my interpretation of the law is wrong and that I'm repeating.  Yes, I agree with you, your Honor.  Yeah, I'm not a lawyer."

After that, Judge Lewis offered his candid assessment that Bulls's request was likely a delaying tactic, but went on to note that "[t]here's a lot of caselaw that says somebody who wants an attorney can do it before jury selection starts."  He then told Bulls, "You made a stupid decision to represent yourself and it's only become apparent to you when the rulings went against you."  He nonetheless granted Bulls's request for the appointment of counsel over the objection of the People.

DISCUSSION

Bulls raises only one issue for our review, claiming that Judge Lewis's "meanspirited" and "harsh" comments coerced him to give up his right to represent himself. Read in context, Bulls's characterization of Judge Lewis's comments does not withstand scrutiny.

In reviewing the record, we bear in mind that "[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." (*People v. Snow* (2003) 30 Cal.4th 43, 78 (*Snow*).)

Here, Bulls's claim is confined to the pretrial context, where he alleges Judge Lewis deprived him of his fundamental right to represent himself by disparaging his legal acumen.[3] On its face, this argument lacks force because no jury was present—a particularly important aspect of cases involving judicial disparagement. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1175 [disapproving defendant's judicial bias claim in large part because he "[did] not demonstrate any way in which the court's pretrial comments impacted the jury"]; *People v. Abel* (2012) 53 Cal.4th 891, 915 ["The court's comment could not have influenced the jury, as the jury did not hear it."]; *Victaulic Co. v. American Home Assurance Co.* (2018) 20 Cal.App.5th 948,

---

[3]     While judicial misconduct can conceivably take any form, there are some well-recognized categories. (See generally Cal. Judges Benchbook: Civ. Proceedings–After Trial (CJER 2020) Judicial Misconduct, § 2.7 [listing recognized types of misconduct].) Among these types of misconduct, two bear some relation to Bulls's claim here: (1) that judges may not ridicule or disparage a party, and (2) that judges may not coerce a party to relinquish a substantial or procedural right.

8

975 [judicial misconduct occurred where judge "openly mocked" a witness in front of the jury].)

*People v. Sturm* (2006) 37 Cal.4th 1218 (*Sturm*), a capital case on which Bulls relies, further highlights the importance of what the jury hears. Two judicial missteps occurred in that case—the trial court's inappropriate comment to prospective penalty phase jurors that premeditation was a " 'gimme' " (*id.* at p. 1231), and the judge's "pattern of disparaging defense counsel and defense witnesses in the presence of the jury, [which] conveyed the impression that he favored the prosecution by frequently interposing objections to defense counsel's questions." (*Id.* at p. 1238.) As the *Sturm* court observed, "[t]rial judges 'should be exceedingly discreet in what they say and do *in the presence of a jury* lest they seem to lean toward or lend their influence to one side or the other.' " (*Id.* at p. 1237, italics added.) A more recent Supreme Court case further emphasized the importance of what occurs in front of jurors in analyzing a claim of judicial bias. (*People v. Nieves* (2021) 11 Cal.5th 404, 482–485.) Often referring back to *Sturm*, the *Nieves* court contrasted the trial judge's pattern of making "persistent, discourteous, and improper remarks" to the jury about defense counsel with reflections of "occasional impatience" that do not amount to bias.

The situation before us falls into the latter category. But even assuming the trial court's comments were as disparaging as Bulls asserts, they occurred only in the presence of counsel, at a hearing that took place before jury selection had even commenced—making this case entirely distinct from *Sturm* or *Nieves*, where the jury witnessed the judge's remarks.

In recognition of this critical distinction, Bulls emphasizes the effect of the judge's comments allegedly had on *him*, claiming he only gave up his right to represent himself because he was ridiculed by the court. But a

9

contextual reading of the hearing transcript does not support this view. For one, arguably the harshest comment ("You made a stupid decision to represent yourself") was made after Bulls repeatedly requested appointment of counsel. As we have already described, Bulls asserted that he wanted a lawyer because the adverse rulings on his motions made him realize he did not understand the law. That Judge Lewis's comments could have contributed to this realization is neither here nor there, because it was not the judge's purportedly harsh tone Bulls was responding to—it was the essential fact that his understanding of the law was deficient. When Bulls realized this, he asked for help, perhaps recalling Judge Amador's advice. And he stated at least three times that he wanted a lawyer because he did not understand the law well enough to continue representing himself. He reiterated this explanation even when his motives were questioned by Judge Lewis.

In contrast, the judicial coercion criticized in other cases involves the court using its powers to cow parties into a course of action. In *Barrientos v. City of Los Angeles* (1994) 30 Cal.App.4th 63, for example, the court sanctioned two opposing attorneys for failing to settle their case. As the appellate court explained, it is not improper for a trial court to "direct litigants to engage in settlement negotiations" but it "may not compel litigants to settle a case." (*Id*. at p. 72.) In the same way, it is not improper for a judge to discourage a defendant from representing himself by making plain the disadvantages that choice will inevitably entail. Judge Amador did as much when he advised Bulls of the old saying that only a fool has himself for a client, and when he stated outright that self-representation was an unwise decision. His advice can hardly be framed as objectionable. Judge

Lewis's comments, while perhaps not as politely phrased, communicated the same point.

In all, we identify no judicial misconduct here—only strong language from the court accompanying Bulls's realization that he was in over his head. The right to represent oneself does not carry with it the right to be shielded from all of the adverse consequences of doing so, including the same harsh reprimand from the court that attorneys can receive for "ask[ing] inappropriate questions, ignor[ing] the court's instructions, or otherwise engag[ing] in improper or delaying behavior." (*Snow, supra*, 30 Cal.4th 43, 78.) Bulls plainly tested the court's patience, and eventually earned rebukes for repeating his arguments on issues the court had already addressed, ignoring the court's explanations, and even contradicting the court.[4] In circumstances such as this, where a somewhat obstinate defendant represents himself, "manifestations of friction between court and counsel, while not desirable, are virtually inevitable . . . ." (*Snow, supra*, 30 Cal.4th 43, 78–79.) That Judge Lewis eventually displayed some level of impatience is hardly surprising. More importantly, it did not amount to coercive judicial misconduct.[5]

---

[4]    For example, when Judge Lewis explained to Bulls that the discovery violations he was focused on were technical and not substantial, Bulls told Judge Lewis his analysis was "false."

[5]    Because we conclude no judicial misconduct occurred here, we need not discuss Bulls's theory of prejudice.

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.