[Crim. No. 3027. In Bank.—July 22, 1927.]

## THE PEOPLE, etc., Respondent, v. PAUL F. MAHONEY, Appellant.

[1] CRIMINAL LAW—MANSLAUGHTER—EVIDENCE—RES GESTAE.—In a prosecution for involuntary manslaughter based upon a charge that appellant built a grandstand negligently or unlawfully, which collapsed, killing a designated person, testimony showing injuries to persons other than the one named, and of the cries, shrieks, and groans of the people in the stand immediately after its collapse, was not a part of the *res gestae* and it was error to admit it as such.

[2] ID.—DECLARATIONS AS PART OF RES GESTAE—ESSENTIALS.—In order that declarations may be considered as a part of the *res gestae* they must have been uttered contemporaneously with and grow out of the act upon which they have a bearing so as to be spontaneous and not narrative, and they must qualify, illustrate, explain, or unfold its character or significance, so as to be connected with it in such manner that the declaration and the act form a single and indivisible transaction.

[3] ID.—CHARACTER OF CRIME.—Acts and declarations admissible as a part of the *res gestae* depend largely upon the character of the crime.

[4] ID.—CONDUCT OF JUDGE—FAILURE TO OBJECT.—While the general rule is that some effort must be made in the trial court to prevent and correct errors in the misconduct of the trial judge when they occur, there may be instances where such efforts would be entirely fruitless, no retraction sufficient to undo the harm and the effort made might result in further error.

---

1. Bystanders' declarations at time of accident as part of *res gestae*, notes, Ann. Cas. 1912C, 319; Ann. Cas. 1917A, 1009; 42 L. R. A. (N. S.) 948. See, also, 10 R. C. L. 980. What included within *res gestae*, notes, 95 Am. Dec. 51; 16 Am. St. Rep. 407. See, also, 10 R. C. L. 975. Declarations made immediately after accident, note, 36 Am. Rep. 899. Statements of injured person, when constitute parts of *res gestae*, note, 34 Am. Rep. 479.

2. When declarations constitute part of *res gestae*, note, 58 Am. Rep. 184. See, also, 8 Cal. Jur. 92; 10 Cal. Jur. 1110. How near the main transaction must declarations be made in order to constitute part of the *res gestae*, note, 19 L. R. A. 733. See, also, 10 R. C. L. 978.

4. See 8 Cal. Jur. 510; 20 R. C. L. 1030.

[5] ID.—UNFAIRNESS OF JUDGE—REVERSIBLE ERROR.—When the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense, it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary, and a plea for the application of section 4½ of article VI of the constitution cannot save the situation; and the fact that the record shows the defendant to be guilty of the crime does not necessarily determine that there has been no miscarriage of justice.

(1) 16 C. J., p. 579, n. 1.   (2) 16 C. J., p. 574, n. 47.   (3) 16 C. J., p. 573, n. 38.   (4) 16 C. J., p. 836, n. 34.   (5) 17 C. J., p. 369, n. 6.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Charles S. Burnell, Judge. Reversed.

The facts are stated in the opinion of the court.

LeCompte Davis and William B. Beirne for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

THE COURT.—The appellant, a contractor, and C. B. Bucknall, deputy building inspector of the city of Pasadena, were charged by indictment with manslaughter. The jurors were unable to agree upon a verdict respecting the charges against Bucknall, but returned a verdict of guilty against the appellant. He appeals from the judgment pronounced upon the verdict and from an order denying his motion for a new trial. The charge against the defendant Bucknall was dismissed by the court upon motion of the district attorney.

It has become the custom on New Year's day of each year to hold a festival of flowers in the city of Pasadena, known as the Tournament of Roses. It is viewed by thousands,

5. Remarks of court showing bias or sympathy or discussing evidence sneeringly or in any manner tending to discredit it, note, 14 Am. St. Rep. 38, 47.  See, also, 8 Cal. Jur. 250, 611; 24 Cal. Jur. 734; 20 R. C. L. 1026.

many of whom pay for seats from which to watch the parade. In December, 1925, the appellant secured from the building department of the city of Pasadena permits to erect four grandstands for the accommodation of these spectators. All of them were constructed along similar lines. The one erected at Colorado and Madison Avenues collapsed. Many people were injured; some were killed, including one Mrs. Bessie Borich, for whose death the jury held the appellant responsible. The prosecution of the appellant was had under section 192 of the Penal Code, defining the crime of manslaughter, and upon the theory that in the erection and construction of the stands the appellant did not exercise due caution and circumspection. We deem it unnecessary to review the nearly two thousand pages of testimony taken in the court below. It suffices to say that there is evidence from which the jury might well conclude that the grandstand which collapsed was so negligently constructed as to be unable to carry the tremendous load placed upon it.

In support of his appeal, which is presented by counsel who did not participate in the trial of the case in the court below, the appellant relies upon alleged error in the introduction of certain testimony offered by the prosecution, and misconduct of the trial judge during the trial. As to both of these matters we adopt the opinion of the district court of appeal of the second district, division two, as the opinion of this court, to wit:

[1] "The appellant first complains of the admission in evidence, over defendant's objection, of testimony showing injuries to persons other than the deceased, Mrs. Borich, and of the cries, shrieks and groans of the people in the stand immediately after its collapse. This testimony was admitted by the trial court on the theory that it constituted a part of the *res gestae*. The offense charged is what has generally been known as 'involuntary manslaughter' or a case 'where death results unintentionally, so far as defendant is concerned, from an unlawful act on his part, not amounting to felony, or from a lawful act negligently performed.' (1 Whart. Crim. Law [8th ed.], sec. 305.) The principal questions in determining the guilt or innocence of the defendant were, first: Was the stand negligently constructed or was it constructed unlawfully or in violation of the ordinance? Second: Did death result from the unlawful

or negligent act? **[2]** It is important to have these main questions, which may be denominated the main transaction, in mind in determining whether the testimony admitted was part of the *res gestae* because we find that declarations which would otherwise be hearsay or evidence of another offense which would not otherwise be admissible under any other exception would be competent if constituting a part of the *res gestae.* In order, however, that they may come within the rule it is necessary that they possess the following characteristics: 'First, they must have been uttered contemporaneously with and grow out of the act upon which they have a bearing so as to be spontaneous and not narrative; second, they must qualify, illustrate, explain or unfold its character or significance, so as, third, to be connected with it in such a manner that the declaration and the act form a single and indivisible transaction.' (Underhill's Crim. Evidence, 2nd ed., sec. 93.) **[3]** It will be observed, therefore, that the acts and declarations admissible as a part of the *res gestae* depend largely upon the character of the crime, or, as said by the same author, section 95: 'The main question is: Are they relevant to, and do they explain and illustrate the facts of the transaction in issue? In other words, can we learn from them something of the motives or intention present in a relevant act?' Tested by these questions, it is apparent that injuries or the extent of injuries suffered by other parties who were present in the grandstand could throw no light either upon the character of the construction or upon the question as to whether faulty construction was responsible for the death of Mrs. Borich. If the stand were negligently or unlawfully constructed the defendant would have been guilty of the offense charged if such construction resulted in her death, regardless of injuries to other persons and regardless of their spontaneous utterances of pain. Undoubtedly such testimony would have great effect upon the sentiments and would tend to arouse the indignation of the jury. We conclude, therefore, that the testimony admitted was not to be considered a part of the *res gestae* and it was error to admit it as such.

**[4]** ''The remaining two points urged by appellant as reasons for the reversal of the judgment may properly be considered under one head. They consist of twenty-three utterances by the trial judge and numerous instances where

he took to himself the task of examining witnesses, which appellant says conveyed to the mind of the jury the impression that the judge was convinced of the guilt of the defendant and that his sympathy was wholly with the prosecution. No assignments of error were made at the time of the occurrences by defendant's counsel and no opportunity given to the court to right the wrong done, if such it was. We are not unmindful of the rule which requires some effort to be made in the trial court to prevent and to correct such errors when they occur. But there may be instances, and this is one of them, where such effort would be entirely fruitless; no retraction sufficient to undo the harm; and the effort made might result in further error. Further, it is evident from the attitude of the trial judge, as shown by the record, that any assignment of misconduct would have been disregarded. Counsel for the appellant, by making an assignment, would have brought upon himself further attack. (*People* v. *MacDonald,* 167 Cal. 545 [140 Pac. 256]; *People* v. *Derwae,* 155 Cal. 592 [102 Pac. 266]; *People* v. *Frank,* 71 Cal. App. 575 [236 Pac. 189].) It would extend this opinion beyond any reasonable bounds to treat each assignment separately, many of which, while perhaps not strictly in keeping with judicial language and discretion, were not of that irremediable nature except when considered as a part of the whole, and therefore we shall consider only a few instances. D. Z. Gardner, a member of the bar, was permitted to testify on behalf of defendant as an expert on construction. During the examination of Mr. Gardner the following occurred: 'A. By the Court: Let's put it this way, Mr. Gardner: From your experience as a builder and contractor of about eight years obtained thirty-four years ago, would you say that the stand in question was constructed in a safe and workmanlike manner? A. Absolutely so. Q. What happened to it, do you know? A. I know it fell down. But— Q. That is all. You have answered the question. A. Yes. I don't think it is hardly fair when the question has been— Q. Now, you are not here to say whether a question that is asked is fair or not, and— A. I understand, Your Honor. Q. . . . the fact that you are an attorney of the court and an officer of the court makes it all the more wrong for you to attempt to make such a statement as that, and if it occurs again I shall hold it a contempt of court, just as I would with any-

body else who is insulting or doesn't show the proper respect for the court. Now, you are here as a witness to answer questions. A. I understand. I want— Q. Never mind what you want. You are here to answer questions, and when you have answered the questions close your face after you have answered the question, and don't let me hear any more remarks of that kind. If you do you will be up here in a structure that will bear a whole lot more weight than any grandstand is intended to bear.' Shortly after this occurrence and immediately preceding an afternoon recess of the court the following statement was made by the trial judge: 'Well, I guess we had better take the afternoon recess, ladies and gentlemen, we don't want to tire our noted expert out.' After Mr. Gardner was permitted to testify as an expert his testimony should have gone to the jury unimpaired by the comment of the court thereon. Realizing the eagerness with which juries grasp the suggestions of the trial judge, we can appreciate the fact that no weight would be attributed by them to his testimony after the remarks just quoted. On more than one occasion the trial judge asked the witness in referring to the grandstand, 'What happened to it?' as though the fact that it had fallen satisfied his mind that it had fallen by reason of negligent construction, eliminating the possibility of a latent defect which due care and circumspection may not always guard against. And to further accentuate his belief when questioning one witness regarding the three stands which did not fall, asked the following question: 'You think the mercy of Providence might have had something to do with it?' Under our present system judges are not permitted to comment upon the evidence or its effect. They cannot be too careful or cautious lest they by word, look or inflection of the voice bring to bear upon the jury an influence not compatible with an unbiased verdict of the jury. (*People* v. *Williams,* 17 Cal. 142, *People* v. *Matthai,* 135 Cal. 442 [67 Pac. 694], and *People* v. *Frank, supra.*) In addition to the foregoing misconduct of the trial judge we deem it proper to instance the following: The counsel for one of the defendants had objected to a question. The witness on the stand had commenced an answer when counsel for the other defendant interposed an objection also. The record then proceeds: 'The Court. The witness had not finished her answer, so I could not very well

rule on the objection, not knowing what the witness' answer is going to be until she finished. And I will instruct counsel not to interrupt the witness again when she is making an answer. Make your objections when the witness finishes the answer or move to strike it out when she has finished, but don't interrupt the witness. Show the witness the common courtesy of allowing her to finish her answer. Mr. . . . Well, but, Your Honor— The Court: Now, that is all I want to hear from you. I expect a witness in my court to be treated with ordinary gentlemanly courtesy, and it is going to be done. Mr. . . . I will be very glad to do that, Your Honor, of course. The Court: Very well; see that you do.' Upon a similar occasion, when another witness was on the stand, the judge said to defense counsel: 'The witness had not finished his answer. He will be allowed to finish his answer, and if there are any more interruptions some one is going to suffer for it.' The record also shows the following, the questioner being the counsel for one of the defendants: 'Q. . . . Mr. Kelly, as chief of police in Pasadena are you an insurer against crime? The Court: Oh, you don't need to answer that question, Captain. That is too utterly silly to require an answer. Q. . . . As head of the department? The Court: Now, that question . . . you know is not a proper question. I am willing to allow a lot for ignorance, but some questions pass the bounds, and that is one of them.' The same witness was examined by the counsel of defendant Bucknall as to the latter's reputation. The record shows: 'Q. He is a man who bears a good reputation in Pasadena? A. Excellent. . . . Q. For his truthfulness? A. Yes, sir. Q. Honesty? A. Yes, sir. Q. Integrity? A. Yes, sir. Q. By the Court: And chastity? A. Yes, sir. The Court: We might as well get them all in.' While the same witness was on the stand the prosecution inquired whether the lumber formerly in the wrecked stand had been changed in its condition after removal from the place where it fell. Upon objection being made by both counsel to certain questions, the judge said to one of them: 'You don't want the officer to testify he slept on it, do you?' During the direct examination of a witness for the prosecution, one of the defense counsel started to say something. Then: 'The Court. Wait just a minute. I think Mr. . . . is laboring with an objection.' A little later the same situa-

tion presented itself when this occurred: 'The Court. Just a moment. Mr. . . . is a little bit slow in getting started, so we will have to give him a little chance to make his objection. Go ahead, Mr. . . . I can always tell from the motions you are making there is an objection about to come forth. Mr. . . . : Yes, Your Honor. The Court: Now you have passed through the preliminary pain, give birth to it.' On another occasion the judge said to one of the counsel for the defense: 'The Court: Well, Mr. . . . has made that objection so many times that I think he ought to have it sustained at least once. . . . I don't want him to be utterly without hope of having that objection sustained some time during the trial.' One of defense counsel objected to the introduction in evidence of certain photographs. After a colloquy over the question whether it was necessary to call as a witness the photographer who took them, the following occurred: 'The Court: Well, it seems to me it is an idiotic objection, to be frank about it. All right, bring the photographer here, since they seem to want to make you a little more trouble. Do you want them to bring the camera here? Mr. . . . No. The Court: You want him to bring the same shoes he had on when he took the picture? How about the gum he was chewing? Do you want him to pick that up again? Just about as sensible. I haven't much patience with an objection which is made just for the purpose of making objection, when there doesn't seem to be a scintilla of sense in making them. A proper objection I have absolute respect for, of course. If a witness testifies a picture absolutely delineates that which he is testifying to, that certainly ought to be sufficient without insisting that the man who did the actual act of pressing the bulb be brought in to testify he pressed the bulb to the camera to take the picture.' While a witness for the defense was being cross-examined by the district attorney this took place: 'Q. . . . Are you a carpenter or a laborer? A. Why, I am a carpenter. Q. By the Court: Belong to the carpenter's union? A. No, sir. Q. By [a deputy district attorney]: Well, I thought you said in answer to his question that you had been working either as a laborer or carpenter, or was I mistaken? The Court: You are not one of those scabs, then, some of the witnesses have referred to as connected with this work? A. Carpenter. I used to work at labor sometimes

when I was a boy.' The owner of the property upon which the collapsed stand was constructed was a witness for the prosecution. After he testified to the consideration paid him for the use of the property and had said that he was on the stand at the time of the collapse: 'Q. By the Court: You had two broken legs of your own in addition to that, didn't you? A. I had two broken legs. Q. That was a premium outside of the other consideration you got?' One of the counsel for the defense objected at one point: 'These questions are leading. The Court: Oh, I don't care if they are. That is an awful trivial objection, unless the question puts the answer directly in the mouth of the witness, but when you are questioning a man who is qualified as an expert I don't see any necessity of consuming about five times the time that is necessary by beating around the bush. You might as well go right at the point and ask about the fact we are interested in.'

"We have presented sufficient to show a state of affairs which trial judges should not permit and which may be pointed to as an example of what they should not do in the trial of lawsuits. If they will lend themselves to such methods, if they will so intemperately espouse the cause of the prosecution in criminal cases, no man charged with a penal offense is safe, whether he be guilty or innocent. Every defendant under such a charge is entitled to a fair trial on the facts and not a trial on the temper or whimsies of the judge who sits in his case. Whatever the degree of guilt of appellant here, those who know the circumstances surrounding his conviction are likely to feel that the verdict resulted from the conduct of the judge and not from the evidence."

The prosecution attempts to justify the remarks of the trial court upon the ground that, because there was sufficient evidence of the negligent and faulty construction of the grandstand to support the finding of the guilt of the defendant, they were "harmless," made in a "facetious light," and that the court was "indulging in a bit of humor." It also invokes the curative provisions of section 4½ of article VI of the constitution. Such an attitude on the part of a trial court as that here disclosed cannot be passed over so lightly. Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during

trials. For this reason, and too strong emphasis cannot be laid on the admonition, a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant. It is unnecessary to cite the cases bearing on this subject. It is a fundamental principle underlying our jurisprudence. [5] When, as in this case, the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense, it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary. Neither can a plea for the application of the section of the constitution save this situation. The fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice. In this case the defendant did not have the fair trial guaranteed to him by law and the constitution.

The judgment of conviction is reversed and a new trial ordered.

SEAWELL, J., Concurring.—I concur in the judgment of reversal, but I do not concur in that portion of the opinion which holds that it was error (presumably prejudicial error) to admit in evidence the exclamations, declarations, and conditions which accompanied and immediately followed the collapsing of the grandstand, the faulty construction of which, it is claimed by the prosecution, amounted to criminal negligence on the part of the defendant. It has always been my understanding of the criminal law that those things which happen at the time of the commission of an act denounced as criminal, or that accompany it or immediately follow it, and which are the natural and immediate result of the act criminally set in motion, are admissible in evidence. If this is not the law then we have almost innumerable decisions in our reports that are misstatements of the real meaning of *res gestae.* A homicide is committed and the person who receives the mortal wound immediately thereafter, in the presence of a score of people who witnessed the infliction of the wound, exclaims, in accusatory words, "You are a murderer." Can it be doubted that such an

exclamation, although accusatory, is admissible? Had the exclamation been one of pain would it be any less admissible as a part of the *res gestae?* The defendant was charged with the negligent construction of a grandstand that was to sustain the aggregate weight of thousands of persons and the fact that a thousand persons were injured by the collapse of the grandstand and the things that immediately ensued were inseparably connected with the negligent act that caused the grandstand to collapse. That question is the crux of the crime charged.

If a person was to fire a rifle at an animal in the park and with one shot kill or wound unto death three or more persons, could it be said that in a trial charging the slayer with manslaughter of one of the victims of his criminal negligence, the admission of the exclamations of the others uttered immediately after being struck by the one bullet was error? Such is not my understanding of the rule. I have no doubt that in a case involving the collapsing of a grandstand, a bridge or other structure, or in case of a railway collision, in which many persons are injured, that the situation as it existed at the time of and immediately following, and which is but the natural result of the negligent act constituting the crime, is admissible. The bloody clothes of a decedent, even in cases where they seem not to be illustrative of an act which is not already shown by other evidence, are quite universally received in evidence. I am not persuaded that a jury would be inflamed beyond the power of self-control by a description of the things that occurred upon the falling of a grandstand crowded with people to the degree that it would inflict upon its builder immedicable wrong. Neither am I able to convince myself that any body of reasonable men would under such circumstances substitute effect for cause. It is scarcely conceivable that the human imagination would not instantly from a recitation of the physical facts supply the things that must inevitably follow. In fact, the result would be but a deduction which the average mind of men would make. I am satisfied that the condition as it existed immediately upon the collapsing of the grandstand is inseparably connected with the charge sought to be established. Surely a jury ought not to permit the horror of a situation alone

to supply substantial evidence and I do not believe that the evidence sought to be excluded had such an effect. Nevertheless it is a part of the case.

Curtis, J., concurred.

Rehearing denied.