Filed 1/30/25  P. v. Grayson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C099468 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-191883) |
| v. | |
| MICHAEL ANTHONY GRAYSON, | |
| Defendant and Appellant. | |

A jury found defendant Michael Anthony Grayson guilty of possessing and transporting methamphetamine for sale.  Defendant argues on appeal two reversable errors occurred at trial:  (1) The trial court committed prejudicial misconduct with its comments and questions and (2) the trial actors' frequent use of the word "street" violated the California Racial Justice Act of 2020 (Racial Justice Act) (Stats. 2020,

1

ch. 317). We affirm defendant's convictions but conclude his sentence stayed under Penal Code[1] section 654 was unauthorized and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

At defendant's trial, Placer County Deputy Sheriff Michael Stoicich testified he pulled defendant over on May 23, 2023, for expired registration. After noticing a glass methamphetamine pipe, Deputy Stoicich and his partner searched the car and found a "satchel or fanny pack" that held about four ounces of suspected methamphetamine. He also found a cell phone and an electronic tablet in the car and approximately $400 in cash in defendant's wallet. Deputy Stoicich arrested defendant and the substance was later determined to be 107.852 grams of methamphetamine.

Rocklin Police Officer Anthony Handley testified, as a narcotics expert, that several messages recovered from the electronic tablet found in defendant's car looked like drug deals. Officer Handley believed that a hypothetical person found with the same amount of methamphetamine and cash as defendant, and who had the same message exchanges shortly before arrest, intended to sell the methamphetamine.

The parties stipulated defendant was convicted in 2016 of transportation of methamphetamine with the intent to sell. Placer County Deputy Sherriff Alisha Slater, a former West Sacramento police officer, testified that for the 2016 conviction, defendant helped an individual he did not know was an undercover officer buy methamphetamine from another party.

Defendant testified in his own defense that the messages involved selling cannabis not methamphetamine, he found the fanny pack with the methamphetamine at a gas station, and he intended to use the methamphetamine found in the bag only for personal use.

---

[1]     Undesignated section references are to the Penal Code.

The jury found defendant guilty of both charged counts of felony possession of methamphetamine for sale (count one) and transportation of methamphetamine for sale (count two). The trial court sentenced defendant to four years (upper term) for transporting methamphetamine and eight months (one-third the midterm) for possession of methamphetamine, stayed under section 654.

Defendant appeals.

## DISCUSSION

## I

### *Defendant Cannot Demonstrate Entitlement*
### *To Relief Based On Judicial Misconduct*

Defendant argues that, through the trial court's "repeated interruptions and remarks, the court portrayed to the jury a clear bias against the defense, and an overall tenor that neither this [defendant] nor his defense was credible. The judicial misconduct cost [defendant] his constitutional rights to a fair trial and due process under the Fifth, Sixth and Fourteenth Amendments, and a reversal is now required." Predicting the People's argument for forfeiture, defendant contends his claim is not forfeited because any objection would have been futile. Alternatively, defendant asserts he suffered ineffective assistance of counsel.

We conclude defendant has forfeited this claim and cannot demonstrate his counsel was ineffective.

## A

### *Additional Background*

The trial court made several objections and comments throughout trial. During Officer Handley's testimony, defense counsel asked what physical manifestations a methamphetamine user would have if he stopped using for a few months. The trial court twice sustained its own objections to this line of questioning based on a lack of foundation. Defense counsel then asked foundational questions about Officer Handley's

3

knowledge of these physical manifestations and established he did not have the requisite knowledge.

During defendant's testimony, defendant testified he started using methamphetamine "[a]round [the year] 2000" but started and stopped throughout the years. Later, defendant was explaining he did not need as much methamphetamine "[b]ack in 1998, '99, 2000 when [he] first started." The trial court interjected and said: "I'm sorry. I need some clarification on that for his testimony. You're saying back in 1998 and '99. You told us earlier you started in 2001. Did you start before 2001 then?" Defendant responded: "No, sir, what I was saying, just to clarify, I was saying -- I was just throwing a number out there as far as '98, '99, 2000, around those times stuff was more potent then, but it's nothing like it is now." The court stated: "Okay. The testimony is what it is. Go ahead, sir." Defense counsel then asked what methamphetamine was like when defendant "first used it in 2005." The court again interjected: "That's not when he first used it." Defendant stated: "2000 is when I first used." The court said to this: "Now it's 2000."

Later, when defendant testified he was a "regular [cannabis] user" and a "regular [cannabis] seller" for the last 10 years, the court asked: "Can you clarify for the [l]adies and [g]entlemen of the [j]ury, what does that mean a 'regular user' and a 'regular seller?' " Defense counsel responded: "Thank you, Your Honor. That actually was my next question." Defense counsel then asked defendant: "How often were you selling [cannabis] around May 23, 2023, for let's say the six months going backwards?" Defendant responded: "Pretty often." Defense counsel then asked where he was selling on May 23, 2023. After defendant responded, defense counsel again asked how often he was selling during the six months prior to May 23, 2023, and the trial court stated: "He answered that. Let's move on. You said pretty often, whatever that means." Defense counsel then asked what pretty often meant and defendant responded: "Nine, ten times a day."

In discussing one of the text messages, defense counsel asked defendant how much cannabis is worth $80. Defendant responded: "I mean, it just depends . . . . Somewhere around an ounce." The trial court interjected: "How much was it for this particular transaction?" Defendant responded: "About an ounce." Then, regarding a text message asking defendant if the person could "come back and get 40," defendant said this was also about cannabis. The court asked: "40 is what? How much?" Defense counsel said: "That was my next question." Defendant answered the question: "At that time it would have been only a quarter ounce because of how good it is." The trial court said: "If it's a quarter ounce, you were selling a whole ounce for $80, so you were losing $80 in an ounce transaction?" Defendant responded: "Like I said, it changes and varies due to the fact of how potent the [cannabis] is usually." To which the court said: "That's why we asked you about this specific transaction."

After defendant testified about another message where someone asked defendant whether he would "trade [defendant] for some tree," the court responded to defendant's testimony: "I need clarification. Is it your testimony that you believe he was contacting you for purposes of him purchasing some [cannabis] from you?" Defendant responded: "Yeah, I think so." The court followed up: "Can you explain to the [l]adies and [g]entlemen then why he would want to trade weed for weed?" Defendant then explained that "sometimes people have better weed. . . . And people have traded [him] weed for weed."

Defense counsel asked defendant about his 2016 conviction by stating: "Were you involved in any actual selling from one person to another that day?" Defendant answered, "No," but the court interjected: "Court's going to sustain its own objection. The answer is stricken. That calls for a legal conclusion the way you phrased it." Defense counsel started asking another question but the court clarified: "Aiding and abetting is being involved." Defense counsel then asked if defendant personally sold any methamphetamine during that incident and the prosecutor objected based on the

5

stipulation. Defense counsel explained: "I'm not trying to debate that he's been convicted. That next question will clarify. I promise." But the court stated: "It's sustained. You have a stipulation."

Finally, during defense counsel's questioning about the fanny pack, which defendant called a "murse," the trial court asked: "So you found another murse other than the one you testified to, the red one?" Defendant responded: "No, I'm saying --," but the trial court interjected: "Well, it says here I found the murse, and you're saying that's a different murse?" Defendant responded: "No, I'm saying I'm taking accountability for the murse. I found a murse but it's not the same exact bag."

Defense counsel never made an objection based on judicial misconduct.

B

*Defendant Forfeited His Judicial Misconduct Claim*

*And Fails To Establish Ineffective Assistance Of Counsel*

"A 'trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution.' [Citations.] Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. [Citation.] When 'the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233.) "As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile." (*Id*. at p. 1237.)

6

Defendant argues two cases from our Supreme Court establish any objection here would have been futile; we disagree. First, in *People v. Mahoney* (1927) 201 Cal. 618, the trial court made "twenty-three utterances . . . and numerous instances where [it] took to [it]self the task of examining witnesses." (*Id*. at pp. 621-622.) Though counsel failed to object, our Supreme Court found such effort would have been "entirely fruitless" because "it [was] evident from the attitude of the trial judge, as shown by the record, that any assignment of misconduct would have been disregarded." (*Id*. at p. 622.) This included telling a witness he did not need to answer because the question was " ' "too utterly silly to require an answer." ' " (*Id*. at p. 624.) And when a defense attorney started speaking, the court said: " ' "Wait just a minute. I think [counsel] is laboring with an objection." A little later the same situation presented itself, when this occurred: "The [c]ourt[:] Just a moment. [Counsel] is a little bit slow in getting started, so we will have to give him a little chance to make his objection." ' " (*Id*. at pp. 624-625.) And to another defense counsel: " ' "[Counsel] has made that objection so many times that I think he ought to have it sustained at least once." ' " (*Id*. at p. 625.) Our Supreme Court found judicial misconduct, in part, because: " 'Under our present system judges are not permitted to comment upon the evidence or its effect. They cannot be too careful or cautious lest they by word, look or inflection of the voice bring to bear upon the jury an influence not compatible with an unbiased verdict of the jury.' " (*Id*. at p. 623.)

Defendant also relies on *People v. Sturm*, *supra*, 37 Cal.4th 1218. There, the trial court "belittled defense witnesses on several occasions," "disparaged defense counsel in front of the jury," "chastised defense counsel for attempting to rephrase a question to which an objection had been sustained," and "[o]n numerous occasions, the trial judge interposed his own objections to questions asked by defense counsel. . . . During the presentation of mitigating evidence by the defense, there were over 30 occasions in which the trial judge either objected sua sponte or otherwise intervened to disallow a question." (*Id*. at pp. 1233-1235.) The trial court "acknowledged the danger that [its] conduct

appeared to favor the prosecution, but one attempt by the court to address this problem only made matters worse," by making comments such as: " 'And I don't want the jury to think because *it appears that I'm ruling against* [*defense counsel*] *99 times out of 100 or making these comments*, but the reason I'm doing it is it seems to me that it is up to me to make the proper rulings.' " (*Id*. at pp. 1235-1236.) Our Supreme Court concluded, "[W]e are convinced that any attempt by defense counsel to object to the trial court's numerous sua sponte objections and derogatory comments 'would have been futile and counterproductive to his client.' " (*Id*. at p. 1237.)

The trial court here never explicitly indicated it would not have considered defendant's objection, and its behavior does not rise to the level of either court in *Mahoney* or *Sturm* to give the impression the trial court was biased against defendant such that it would not have entertained an objection to its comments. The objections the trial court made and the questions it interjected did not include any language belittling defendant or his counsel or explicitly stating it disbelieved any of defendant's testimony. The trial court did ask questions of witnesses, something *Mahoney* found improper. (*People v. Mahoney*, *supra*, 201 Cal. at p. 623.) But the law has changed on this point since *Mahoney*. Effective in 1934, seven years after *Mahoney*, the California Constitution was amended to state: "The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10; see *People v. Rodriguez* (1986) 42 Cal.3d 730, 766 ["In 1934, however, the Constitution was amended to restore the power of comment in broad terms"].) We therefore conclude defendant forfeited his claim on this issue because it was not fruitless for defendant to object if he believed there was judicial misconduct.

We also conclude defendant has not established he suffered ineffective assistance of counsel. " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness

8

under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]' [Citations.] If the defendant makes an insufficient showing on either component, the claim must fail. [Citation.] 'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' [Citations.] 'A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1158.)

Here, there is nothing in the record shedding light on why defense counsel did not object to the trial court's comments. There is also a reasonable explanation for the lack of any objections; defense counsel believed there was no basis to object. Again, the trial court was permitted to ask witnesses questions, including to clarify testimony. (Cal. Const., art. VI, § 10.) Defendant also does not challenge on appeal as baseless any one of the trial court's rulings or comments. Defendant instead presents statistics on how many times the trial court ruled against the defense and in favor of the prosecution as proof of bias. But this does not eliminate the possibility the trial court was right on each of those rulings. For example, the trial court objected on foundation to one of defense counsel's questions to Officer Handley but defense counsel's later questioning established Officer Handley did not have the requisite knowledge. And defense counsel mentioned multiple times he intended to ask the same questions the trial court asked first.

Defense counsel was also better positioned to assess the court's statements. The import of the statements could depend on context, context we cannot discern from the record. For example, the statement defendant takes most issue with is the trial court

9

saying "[a]iding and abetting is being involved."  Defendant contends that "[w]hen the [trial] court told the jury that [defendant] was aiding and abetting in 2016[,] it took upon the role of fact finder as well."  But this is only one way to understand this statement.  The trial court's statement could also be understood as focusing on whether "[a]iding and abetting" legally constituted being "involved" in a drug sale.  This would be a legal ruling on general legal standards applicable to the parties' stipulation, not a factual determination of defendant's involvement.  Context could matter here if the trial court somehow indicated through emphasis, volume, speed, or body language it thought defendant's culpability was anything other than what defendant indicated during testimony.  But this is context we lack but defense counsel had.

Context is also important for the other statements defendant challenges:  "The testimony is what it is," "[n]ow it's 2000," "whatever that means," and "[t]hat's why we asked you about this specific transaction."  Even assuming the trial court's comments were improper, defense counsel could have reasonably determined they were minimal based on how the trial court made them, and also within in the entire context of the trial.  From this, defense counsel could have decided calling attention to them would have needlessly distracted from defendant's case.

We therefore conclude there was a reasonable basis for defense counsel not to object to the statements defendant now challenges on appeal.  "Accordingly, we cannot conclude 'this is one of those "rare" cases in which counsel's failure to object amounts to constitutionally deficient performance.' "  (*People v. Singh* (2024) 103 Cal.App.5th 76, 118 (*Singh*).)

II

*Defendant Cannot Demonstrate Entitlement*

*To Relief Based On The Racial Justice Act*

Defendant next contends the trial actors violated the Racial Justice Act by "impermissibly us[ing] negative racial stereotypes about Black people's propensity for

10

drug sales or 'street' crimes." We conclude defendant also forfeited this claim and failed to establish his counsel was ineffective.

## A

### *Additional Background*

The parties, attorneys, witnesses, and court used the word "street" many times throughout trial. Officer Handley explained he was trained on "typical street crime narcotics offenses," which included investigations "from street level dealer[s] all the way up to cartel level dealer[s]." Officer Handley later testified $40 could buy an "eightball" of methamphetamine, and the court asked, "Is that street talk or what type of vernacular is that?" Officer Handley explained, "[I]t's an 8th of an ounce." The court followed up: "And is that an eightball, is that how it's referred to amongst users and dealers?" Officer Handley replied: "Yes, sir, that's street slang typically when referring to an 8th of an ounce." Officer Handley later, in analyzing one of defendant's messages, explained some users are "just trying to get by. Like at the time that's your typical street level user."

On cross-examination of Officer Handley, defense counsel asked whether he had experience with cannabis investigations and if he knew "what the cost of that product [wa]s on the street." The trial court eventually sustained the prosecutor's objection to these questions on relevance grounds. Defense counsel then asked Officer Handley if he knew whether the cost of illegal drugs generally changed over the last seven or eight years "on the street." The court again sustained a relevance objection on these questions.

Defense counsel later asked Officer Handley how methamphetamine can be ingested, including whether "it can actually be taken in a pill form and prescribed for [attention deficit hyperactivity disorder]." Officer Handley was aware of a pill called "Desoxyn" that is a "pharmaceutical, manufactured in a laboratory" and may have some chemical similarities with methamphetamine, but said that's not the same as the "street

11

level methamphetamine," which he testified can be manufactured "in a bathtub in Del Paso Heights."

During Deputy Slater's testimony about defendant's prior offense, the prosecutor asked how an undercover drug deal is typically organized. Deputy Slater testified a surveillance team and cover team are present because "a lot of times[,] at the street level[, circumstances] can become very, very dangerous, so a lot of rip offs and things like that. So the surveillance team is usually there, set, ready to go in case something bad happens." Later, when the prosecutor asked if she tested the suspected methamphetamine from that drug deal, Deputy Slater responded: "Yes. So during this time we were still testing the drugs on the street ourselves because we didn't have a Fentanyl problem at that time." At the end of Deputy Slater's testimony, she responded to jury questions, including one asking who sold the methamphetamine to the undercover officer if it was not defendant. Deputy Slater stated: "[T]he undercover officer was negotiating the purchase of the methamphetamine from [defendant] on this day. He did not know that there was going to be what's called on the streets 'a connection' that was going to show up," and it was this "connection" who sold the methamphetamine.

Finally, during cross-examination of defendant, the prosecutor asked whether defendant knew it was illegal for defendant to sell cannabis "on the street."

Defense counsel never made an objection based on the Racial Justice Act.

B

*Defendant Forfeited His Racial Justice Act Claim And*
*Failed To Establish Ineffective Assistance Of Counsel*

Defendant contends, "From the outset, [his] trial was racialized." Defendant explains, "[T]he associations the jury drew about our Black [defendant], because of the trial actors' more than two dozen references to the 'street', are obvious: Dangerous drugs are found on the 'street', and the 'street' is the habitat of Black people and other minorities." To support his claim, defendant provides several articles, studies, and

12

"mainstream hip-hop songs [that] reference not only the 'code of the street', but specifically reference dealing drugs 'on the street.' " Again predicting the People's forfeiture argument, defendant argues against forfeiture because (1) this is a "question of law" and (2) this is a matter " 'involving the public interest or the due administration of justice.' "

The Racial Justice Act created section 745, effective on January 1, 2021. (Stats. 2020, ch. 317, § 3.5.) Section 745, subdivision (a) provides: "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of" a list of specific circumstances. Relevant here, one circumstance is: "During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language." (§ 745, subd. (h)(4).)

Racial Justice Act claims may be forfeited if not brought with the trial court. Section 745, subdivision (c) states, "A motion made at trial *shall be made as soon as practicable* upon the defendant learning of the alleged violation. A motion that is not timely may be deemed waived, in the discretion of the court." (Italics added.) Section 745, subdivision (b) also states: "For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence." Other courts have found "it significant that the Legislature did not include any language to the effect that a section 745 claim may be raised on direct appeal 'for the first time,' which it could have easily done . . . . The omission of such language strongly

13

suggests the Legislature intended to leave the issues of preservation and forfeiture of claims on direct appeal to be resolved by the courts based on long-standing procedural canons. . . . Here, we see no compelling reason to add words to the statute as the legislative history does not evince an intent by the Legislature to strip the courts of their discretionary authority to determine whether a section 745 claim is reviewable on direct appeal where the claim could have been but was not presented in the trial court." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 814-815; see *Singh*, *supra*, 103 Cal.App.5th at p. 114, quoting *Lashon*, at p. 814.)

Defendant does not contest the forfeitability of Racial Justice Act claims, instead making two arguments against applying forfeiture here; both lack merit. First, defendant claims he is presenting a pure issue of law. To the contrary, his claim requires reference to the specific testimony delivered in his case within the context of the case as a whole. This would also include weighing the extensive evidence defendant presents for the first time on appeal regarding an objective observer's expectation. (See *Singh*, *supra*, 103 Cal.App.5th at p. 116 [finding whether a witness used racially discriminatory language in violation of the Racial Justice Act "is not a constitutional challenge that presents a pure question of law"].)

Second, defendant argues reaching the merits of his claim benefits the public interest by citing to the Legislature's intent to eliminate racial bias in criminal proceedings. If we were to follow defendant's logic that the public generally benefits from application of its laws, then every Racial Justice Act claim would be excused from forfeiture. For the reasons previously articulated, the Legislature did not foreclose forfeiture of Racial Justice Act claims and instead granted courts discretion to consider forfeited claims under settled authority. Defendant has pointed to no benefit outside of his own that would result from reaching the merits of his case, and we therefore conclude defendant forfeited this claim.

14

We also reject defendant's claim of ineffective assistance of counsel on this issue. Incorporating the above standards for such a claim, we again find no reason given in the record for defense counsel's failure to make a Racial Justice Act claim and instead conclude there is a reasonable reason for such a tactic:  Defense counsel could have believed there were no racial overtones, implicit or otherwise, in the usage of "street." (See *Singh*, *supra*, 103 Cal.App.5th at p. 117  ["defense counsel could reasonably have concluded the statement, specifically the question about whether the shooting was an 'honor kill,' did not violate the Racial Justice Act"].)  This is supported by defense counsel's own use of the word street when questioning Officer Handley.  And most of the instances of "street" were used for seemingly innocent reasons, to either describe the level of the drug interaction—a low-level user or dealer as opposed to a high-level or cartel-level dealer—or the physical place where the activity took place—such as Deputy Slater testifying to testing the drugs "on the street."  Defendant offers alternative words he argues would have eliminated the racial undertones of " 'street' " such as " 'typical', 'routine', 'run-of-the-mill', 'average', 'regular', [and] 'conventional.' "  But these do not describe the comparative placement on a hierarchy, nor do they describe a physical location.

There were instances of a more abstract usage, such as describing "street slang," which included phrases like "eightball."  But again, we are at a disadvantage to fully assess how these words were used given the state of the record and lack of objection. More importantly, defense counsel could better assess usage, tone, and body language, and whether bias was inherent in the term's use.

Finally, it could have been a legitimate tactic not to draw attention to these few phrases in the scheme of the entire trial.  It does not appear the word *street*, or any of the phrases defendant challenges, were used in direct relation to defendant, neither calling him the product of the streets, nor that he was connected with methamphetamine made "in a bathtub in Del Paso Heights," for example.  Defense counsel could have reasonably

decided not to object to these statements or "seek a redaction of the statement because the defense did not want the jury to think the defense was hiding anything from them. Accordingly, we cannot conclude 'this is one of those "rare" cases in which counsel's failure to object amounts to constitutionally deficient performance.' " (*Singh*, *supra*, 103 Cal.App.5th at p. 118.)

### III

### *There Was No Cumulative Error*

Defendant finally contends, if we conclude "each error [is] individually harmless, the cumulative effect of the errors nevertheless demonstrates that a miscarriage of justice occurred." We have no basis to conclude cumulative error because defendant forfeited each individual claim of error and did not demonstrate his counsel was ineffective. (See *People v. Sapp* (2003) 31 Cal.4th 240, 316.) We must therefore reject this cumulative error claim.

### IV

### *Defendant's Sentence Is Unauthorized*

The People ask us to remand for resentencing because the trial court erroneously imposed one-third the midterm on count one, the possession conviction, which it stayed under section 654. Defendant does not address this issue in his reply brief.

We agree with the People defendant's sentence is unauthorized. Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) " 'The one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not to a sentence stayed under section 654.' " (*People v. Relkin* (2016) 6 Cal.App.5th 1188, 1197-1198.) "To effectuate section 654, the trial court must impose a full term and stay execution of that term." (*Relkin*, at p. 1198.)

16

Because the trial court imposed a consecutive eight-month term (one-third the midterm) for count one and stayed this term under section 654, which is not subject to the one-third the midterm limitation for consecutive sentences (see *People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164), we shall remand for resentencing.  The trial court must determine whether to impose a lower, middle, or upper full term on count one, and then stay the sentence of either count one or two under section 654.

DISPOSITION

The sentence is reversed.  The case is remanded for resentencing for the trial court to impose full sentence on both counts and stay sentence on either count one or count two under section 654.

/s/
ROBIE, Acting P. J.

We concur:

/s/
RENNER, J.

/s/
FEINBERG, J.